**NATIONAL GERIMEDICAL HOSPITAL AND GERONTOLOGY CENTER, Plaintiff,**

v.

**BLUE CROSS OF KANSAS CITY and Blue Cross Association, Defendants.**

**No. 78–0359–CV–W–3.**

United States District Court,
W. D. Missouri, W. D.

Nov. 2, 1979.

James M. Beck, Steven M. Leigh, Johnson, Lucas, Bush, Snapp & Burgess, Kansas City, Mo., for plaintiff.

John C. Noonan, Randall E. Hendricks, Stinson, Mag & Fizzell, Kansas City, Mo., for defendant Blue Cross Assn.

Shughart, Thomson & Kilroy and Max O. Bagby, Bagby, Benjamin & Arnold, Kansas City, Mo., for defendant Blue Cross of Kansas City.

## ORDER

RUSSELL G. CLARK, District Judge.

On May 23, 1978, plaintiff, National Gerimedical Hospital and Gerontology Center (hereinafter referred to as National Gerimedical) filed a complaint against Blue Cross of Kansas City and Blue Cross Association alleging violations of the antitrust provisions of state and federal statutes.

Count I of the complaint alleges that the defendants and various named co-conspirators have engaged in a conspiracy in restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff alleges in Count II that the defendants engaged in a continuing combination and conspiracy to boycott National Gerimedical in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Count III alleges that defendant Blue Cross Association and Blue Cross of Kansas City and their co-conspirators have combined and conspired in a continuous combination and conspiracy to boycott plaintiff hospital and coerce all Blue Cross subscribers to refuse to deal with plaintiff, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Count IV alleges that the defendants' actions were an effort to control market entry and dictate terms of access to the health care services market and constitute an unlawful abuse of monopoly power in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Counts V through VIII allege violations of similar provisions of the state antitrust laws, Missouri Revised Statutes § 416.031, subd. 1 through § 416.031, subd. 2.

On July 14, 1978, defendant Blue Cross Association and defendant Blue Cross of Kansas City filed motions to dismiss plaintiff's amended complaint. After considering the parties' suggestions in support and in opposition thereto, the Court refrained from deciding the issues raised by the motion to dismiss pending the Supreme Court's decision in *Group Life and Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261. Subsequent to the Supreme Court decision in that case on February 27, 1979, the parties have briefed the issue of the application of that case to the present facts. The defendants base their motion to dismiss the federal causes of action on essentially four grounds: (1) The conduct complained of is exempted from the antitrust laws by the provisions of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015; (2) the National Health Planning & Resource Act of 1974 impliedly repealed the antitrust laws where the challenged conduct is necessary to effectuate the purpose of the Act; (3) plaintiff's complaint does not allege any ultimate facts to support a claim that the defendants engaged in a conspiracy within the meaning of the antitrust laws; and (4) prepaid medical plans

offered by not-for-profit corporations are not "trade or commerce" within the meaning of the Sherman Act. Additionally, the defendants argue that if the federal claims are dismissed for lack of jurisdiction, the Court should exercise its discretion and dismiss the pendent state claims.

In an order issued October 11, 1979, this Court indicated that because it was considering matters outside the pleadings presented by the parties, it would treat the motion to dismiss as one for summary judgment in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure. The parties were given an opportunity to present additional evidence or to oppose this proposed action. All parties have indicated that they have no further evidence to present and do not oppose this treatment by the Court.

Rule 56(c) provides in part that summary judgment should be granted when:

. . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

It is well established that in considering a motion for summary judgment, the Court examines the evidence not to decide issues of fact but to determine if any real issues exist. *Krupin v. United States*, 439 F.Supp. 440 (E.D.Mo.1977); *Bazzano v. Rockwell International Corp.*, 439 F.Supp. 1167 (E.D. Mo.1977). The existence of some disputed facts in a case does not necessarily preclude the Court from granting summary judgment. To preclude summary judgment, the disputed facts must be material and of the type that would affect the outcome of the litigation. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975). Where legal questions of statutory construction involving legislative history and policy are concerned, summary judgment is an appropriate mechanism for disposing of these issues. *Mobil Oil Corp. v. Federal Energy Adm.*, 566 F.2d 87, 91–2 (Em.App.1977).

The Eighth Circuit has consistently recognized that summary judgment is an extreme remedy which should not be granted unless the movant establishes his right to judgment with such clarity as to leave no room for controversy. *Ledwith v. Douglas*, 568 F.2d 117 (1978); *Unlaub Co. v. Sexton, Inc.*, 568 F.2d 72 (8th Cir. 1977).

In considering this motion the Court must view the facts most favorably to the party opposing the motion and give that party the benefit of any reasonable inferences to be drawn from the facts. *Ledwith*, supra; *Unlaub*, supra; *New England Mutual Life Ins. Co. v. Null*, 554 F.2d 896, 906 (8th Cir. 1977). From all of the pleadings the Court has reviewed, it would appear that there is no material dispute as to the following facts which are a summary of the essential allegations of plaintiff's complaint by Blue Cross of Kansas City:

1. Plaintiff is a Missouri not-for-profit corporation which will open a *new* hospital on or about July 30, 1978 (Paragraph 3, Complaint);

2. Defendant Blue Cross of Kansas City is a Missouri not-for-profit Health Service corporation which offers private individual and group health care reimbursement plans and programs to the general public in Missouri and Kansas, and which contract with member hospitals and with other health service provides for the administration of its health care reimbursement plans (Paragraph 4, Complaint);

3. Blue Cross is a major provider of private health care plans in Western Missouri and Eastern Kansas (Paragraph 13, Complaint);

4. All acute general care hospitals except plaintiff in the Blue Cross service area have contracted with Blue Cross and thus are "participating" hospitals. (*Ibid.*);

5. Blue Cross reimburses its individual subscribers for 100% of all covered hospitals services, by direct payment to the hospital, for services at a participating hospital (*Ibid.*);

6. Blue Cross subscribers receive payment for 80% of covered hospital services performed at a non-participating hospital, which reimbursement is paid directly to the subscriber, not the hospital (*Ibid.*);

7. Blue Cross denied plaintiff a participating Member Contract solely because plaintiff failed to demonstrate a need for its hospital (Paragraph 17, Complaint);

8. Among the "Prerequisites" for membership in Blue Cross, was the requirement that a hospital "meet a clearly evident need for health care services in its defined service area." (Paragraph 18, Complaint);

9. In order to determine "clearly evident need" Blue Cross designated Mid-America Health Systems, Inc. ("MAHSA") a not-for-profit, non-governmental organization, engaged in the voluntary evaluation of health care services in Missouri and Kansas as the agency to conduct "need review" (Paragraphs 6 and 18(a), Complaint);

10. Blue Cross will not contract with any hospital as a "participating member hospital without MAHSA approval of need" (Paragraph 18(a), Complaint);

11. MAHSA has no power to impose sanction to enforce its determinations nor to compel review (Paragraph 18(b), Complaint);

12. MAHSA has publicly stated that it will disapprove and not consider favorably the addition of any acute care hospital beds.

Plaintiff's answers to interrogatories clarify one point. National Gerimedical Hospital's initial application to become a Blue Cross member hospital was made October 4, 1977 and was amended and resubmitted on February 15, 1978. (See Plaintiff's answer to Interrogatory No. 9, Ex. D.) On March 21, 1978 National Gerimedical Hospital was denied member status because it had not received approval through the voluntary health planning process. National Gerimedical has indicated that it never sought review by Mid-America Health Systems Agencies. (See Plaintiff's answer to defendant's interrogatory No. 16, Ex. F.)

Thus this is not a situation where Mid-America Health Systems has refused to issue a certificate of need to National Gerimedical Hospital, but rather plaintiff is challenging the policy of Blue Cross requiring them to seek Mid-America Health Systems' approval.

*Application of McCarran-Ferguson Act*

■ § 2 of the McCarran-Ferguson Act, 15 U.S.C. § 1012(a) and (b) provides in part:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

In essence this Act has been interpreted to exempt the application of the antitrust laws from the business of insurance if it is regulated by the state and if the challenged action does not involve a boycott, coercion or intimidation. In determining the initial applicability of the McCarran-Ferguson Act, two questions must be answered: (1) are the defendants engaged in the "business of insurance" and (2) is the challenged conduct regulated by state law? In order for the activity to be exempt from the application of the antitrust laws, both of the above criteria must be satisfied.

The briefs of Blue Cross of Kansas City and and Blue Cross Association submitted in July of 1978 cited numerous case decisions holding that hospital-provider contracts are the business of insurance, regulated by state law, and thus exempt from application of the antitrust laws. Had the

Court been deciding this issue prior to February 27, 1979, it would have adopted the rationale of these decisions and found that hospital payments and subscriber rates were so interrelated that Blue Cross contracts with hospitals were a part of the business of insurance. Additionally, the Court would have found that the requirements of state regulation of the business of insurance had been met. However, the Court believes that in light of the language used by the Supreme Court in *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) the rationale of these earlier circuit court opinions is no longer valid.

In *Royal Drug* eighteen owners of independent pharmacies sued Blue Shield of Texas. Blue Shield offers insurance policies on prescription drugs. If an individual covered by one of these policies utilizes a pharmacy which has entered into a "pharmacy agreement" with Blue Shield, the insured pays $2.00 and the remainder of the prescription price is paid by Blue Shield. If the pharmacy selected is a non-participating pharmacy and has not signed such an agreement with Blue Shield, the individual must pay the full price charged for the drug by the pharmacy. The insured can then obtain a reimbursement for 75% of the difference between the price charged minus $2.00. Under the agreement Blue Shield agreed to reimburse a participating pharmacy for the pharmacy's cost of acquiring the drug plus the $2.00 paid by the individual. Thus only pharmacies that could afford to distribute prescription drugs for less than the $2.00 markup could profitably participate in the plan. In determining if the contract between Blue Shield and the pharmacies was exempt from the application of the antitrust laws because of the McCarran-Ferguson Act, the Court identified one of the primary elements of an insurance contract as the spreading and underwriting of the policyholder's risk. Petitioners in the *Royal Drug* case argued that these pharmacy agreements did involve the underwriting of risk. Although the Court recognized that some type of provider agreement will be necessary for the existence of a service benefit plan, the Supreme Court was unwilling to infer that because an agreement is necessary to provide insurance, it is also "the business of insurance". *Royal Drug*, supra 'at 214, 99 S.Ct. at 1074, 59 L.Ed.2d at 270 ftn. 9. In rejecting this argument, the Court found:

> The fallacy of the petitioners' position is that they confuse the obligations of Blue Shield under its insurance policies, which insure against the risk that policyholders will be unable to pay for prescription drugs during the period of coverage, and the agreements between Blue Shield and the participating pharmacies, which serve only to minimize the costs Blue Shield incurs in fulfilling its underwriting obligations. .
>
> * * * The Pharmacy Agreements thus do not involve any underwriting or spreading of risk, but are merely arrangements for the purchase of goods and services by Blue Shield. By agreeing with pharmacies on the maximum prices it will pay for drugs, Blue Shield effectively reduces the total amount it must pay to its policyholders. The agreements thus enable Blue Shield to minimize costs and maximize profits. Such cost savings arrangements may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of *lower premiums, but they are not the* "business of insurance."

The Pharmacy Agreements are thus legally indistinguishable from countless other business arrangements that may be made by insurance companies to keep their costs low and thereby also keep low the level of premiums charged to their policyholders. *Royal Drug*, supra at 213–215, 99 S.Ct. at 1075, 59 L.Ed.2d at 269–270.

Another reason for rejecting the claim that these contracts involved the business of insurance was the fact that the contracts in the *Royal Drug* case were not between insurer and insured but were separate contractual arrangements between Blue Shield and the pharmacies engaged in the sale and distribution of goods and services other than insurance. The Court stated:

At the most, the petitioners have demonstrated that the Pharmacy Agreements result in cost savings to Blue Shield which may be reflected in lower premiums if the cost savings are passed on to policyholders. But, in that sense, every business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer. The manager of an insurance company is no different from the manager of any enterprise with the responsibility to minimize costs and maximize profits. If terms such as "reliability" and "status as a reliable insurer" were to be interpreted in the broad sense urged by the petitioners, almost every business decision of an insurance company could be included in the "business of insurance". Such a result would be plainly contrary to the statutory language, which exempts the "business of insurance" and not the "business of insurance companies." *Royal Drug*, supra at 216–217, 99 S.Ct. at 1076, 59 L.Ed.2d at 271–272.

Defendants have attempted to distinguish the *Royal Drug* case on the grounds that the provider contract involved here contain the indispensable characteristic of insurance, i. e. the underwriting and spreading of risk. In support of this argument, the defendants suggest:

Under the provider contract Blue Cross agrees to reimburse hospitals for services rendered to its subscribers *only so far as current earned income will permit.* (Article IVA, Provider Contract). Unless provisions for all expenses and allocations to reserves have been made in each month, earned income cannot be used to pay hospitals (Articles IVC, IVD). If Blue Cross does not have sufficient funds to pay benefit payments in full to hospitals, each of the provider hospitals is to receive only a portion of the benefit payments on a pro rata basis from Blue Cross. [pp. 3–4, Reply of Blue Cross of Kansas City To Supplemental Suggestions of National Gerimedical Hospital in Opposition to Defendants' Separate Motions to Dismiss filed April 9, 1979.]

Were the Court to agree with defendants' interpretation of the contract, it is doubtful if *Royal Drug* would be sufficiently distinguished to render its holding inapplicable. However, the Court's interpretation of the provider contract in this case is not totally in accord with the defendants. Article IVB does require reserves to be maintained by Blue Cross sufficient to provide for three months operating expenses and benefits for hospital services. After provisions for reserves have been made, benefit payments each month are to be made to the hospitals equal to the amount of benefits due for all claims processed by Blue Cross. If sufficient funds are not available, adjustment on a pro rata basis is to be made; however, Article 4D provides:

D. If benefit payments to HOSPITAL for Hospital Service are reduced because of the application of Article IV, C above, BLUE CROSS agrees to pay pro rata the amount of such reduction to all hospitals as current earned income becomes available for such purpose.

Thus, the risk of nonpayment does not fall on the hospital as the defendants suggest, but payment is eventually to be made as funds become available on a pro rata basis.

Comparison of the Blue Cross provider contracts in this case and the Blue Shield pharmacy agreements in *Royal* have convinced the Court that no rational basis for distinguishing these contracts exist. Further, the language of the Supreme Court seems to clearly imply that such distinctions should not be drawn and would be looked on with disfavor.

If agreements between an insurer and retail pharmacists are the "business of insurance," because they reduce the insurer's costs, then so are all other agreements insurers may make to keep their costs under control—whether with automobile body repair shops or landlords. Such agreements would be exempt from the antitrust laws if Congress had extended the coverage of the McCarran-Ferguson Act to the "business of insurance companies". But that is precisely what Congress did not do. *Royal Drug*,

supra at 232, 99 S.Ct. 1083, 1084, 59 L.Ed.2d at 281.

The Supreme Court went on to add:

There is no principled basis upon which a line could rationally be drawn that would extend the McCarran-Ferguson Act exemption only to an insurer's agreement with providers of goods and services to be furnished to its policyholders—such as agreements with hospitals, doctors, lawyers and the like. But assuming that such a line could rationally be drawn, to hold that even such provider agreements are the "business of insurance" is to ignore the language and purpose of the Act not to exempt the insurance industry as such from the antitrust laws. *Royal Drug*, supra at 232, 99 S.Ct. at 1083, n. 40, 59 L.Ed.2d at 281.

Therefore, defendants' motions for summary judgment on the basis that the conduct in this case involved "the business of insurance" and is thus exempt from the antitrust laws under the McCarran-Ferguson Act must be denied.

*Implied Repeal of The Antitrust Laws*

Secondly, the defendants have moved to dismiss the federal causes of action on the grounds that the National Health Planning and Resource Development Act of 1974 impliedly repealed application of the federal antitrust laws in the instant case. The doctrine of implied immunity or implied repeal of the antitrust laws is a judicially created exemption from the application of the antitrust laws which has been utilized to resolve potential conflicts between federal or state regulatory schemes and the antitrust laws. The Supreme Court has indicated that implied immunity has been adopted and applied:

in particular and discrete instances to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts exercising jurisdiction under the antitrust laws. *U. S. v. National Assn. Securities Dealers*, 422 U.S. 694, 734, 95 S.Ct. 2427, 2450, 45 L.Ed.2d 486, 513 (1975).

■ A number of well established principles can be derived from cases that have considered this doctrine. First, any immunity from the antitrust laws should not be lightly implied and repeal by implication is not favored. *Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *U. S. v. American Telephone & Telegraph Co.*, 427 F.Supp. 57 (E.D.La.1976). In considering a claim of implied repeal of the antitrust laws, the Court should first attempt to reconcile the operation of the antitrust laws and the regulatory statutes. *Essential Communication v. American Telephone & Telegraph*, 446 F.Supp. 1090 (D.N.J.1978). If reconciliation is not possible, for the reason that a clear repugnancy exists between the statutes or the particular provisions at issue and the antitrust laws, then an exemption may be created; however, the antitrust laws should be repealed only to the extent necessary to make the regulatory statute effective and then only to the minimum extent needed. *Gordon*, supra 422 U.S. at 682, 95 S.Ct. at 2611, 45 L.Ed.2d at 479. *Mount Hood Stages v. Greyhound*, 555 F.2d 687 (9th Cir. 1977); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 460 F.Supp. 1359 (D.Haw. 1978); *Cavanagh Communities Corp. v. New York Stock Exchange*, 422 F.Supp. 382 (S.D.N.Y.1976); see Application of Federal Antitrust Laws as Affected by Other Federal Statutes or the Federal Constitution, Annotation 45 L.Ed.2d 841.

■ After determining a conflict exists, the Court must also consider the manner in which Congress envisioned the conflict to be resolved. Therefore, the Court is faced with two issues in determining the effect of the National Health Planning and Resource Development Act of 1974. First, is there a conflict between this legislation and the antitrust laws. Secondly, how should that conflict be resolved.

■ In resolving the first issue, the Court must examine the 1974 National Health Planning and Resource Development Act. This Act was essentially composed of four parts: First, National Health

Planning and Development, 42 U.S.C. § 300k–1 through 300n–5; second, assistance for construction and modernization of health facilities; third, miscellaneous provisions on the transition to the new program; and fourth, the Radiation, Health & Safety Act of 1974 amending the Public Health Service Act in this area. See Volume 4, U.S.Code Cong. & Adm.News (1974) p. 7842. The only portion of the Act with which the Court is concerned in this case is Subchapter XIII entitled "National Health Planning and Development".

The National Health Planning and Development portion of the Act established national health priorities. The Secretary of HEW was directed to issue guidelines concerning national health planning goals after considering the national health priorities established by Congress in this section of the Act. Two goals that were established by the Act and of special concern to Congress as evidenced in the Act and in its accompanying legislative history were: (1) reduction of hospital costs; and (2) elimination of unnecessary duplication of health care facilities. The Secretary was also directed to set standards concerning the appropriate supply, distribution and organization of the nation's health resources. See 42 U.S.C. § 300k–1 through 300k–2. The National Advisory Council on health planning and development was established to advise and consult with HEW and to make recommendations to that department concerning the development of appropriate guidelines. 42 U.S.C. § 300k–3.

The Act provided for the establishment of health service areas in accordance with a number of very specific requirements set forth in 42 U.S.C. § 300l. To service these areas, health systems agencies were to be established in each health system area. These agencies were given responsibility for health planning and resource development in their particular area. 42 U.S.C. § 300l–2(b). Each health systems agency was to adopt a health service plan and an annual implementation plan. The functions assigned to the health service area were to effectuate the purposes of: (1) improving the health of the residents of their area; (2) increasing accessibility, acceptability and quality of the health services provided in their area; (3) restraining increases in the cost of health care; and (4) preventing unnecessary duplication of health resources. 42 U.S.C. § 300l–2. Procedures were also established for a state health planning and development program. The Act further provided that to implement the health service plan and the annual implementation plan, the Health Service Agency should seek the assistance of individuals, public and private entities, in its health service area. See 42 U.S.C. § 300l–2(c)(1). It thus appears that the Act authorized and anticipated that the health service agency established by its provisions would consult and work with private health care providers to attempt to achieve voluntary cooperation with the goals of the agency and of the Act.

Mid-America Health Systems Agency was one of 205 regional health systems agencies established under the Act and conditionally designated as the health planning body for the eight county bi-state area encompassing the counties of Cass, Clay, Jackson, Platte and Ray in Missouri and Johnson, Levenworth and Wyandotte in Kansas. In November of 1977 Mid-America Health Systems established a health systems plan for 1978 through 1982 in this region. Increasing hospital costs and unnecessary duplication of facilities and equipment were considered two of the biggest problems in this region. The health systems plan adopted by Mid-America Health Systems recognized:

> Problem—The acute inpatient care system does not function in a coordinated manner which is cost-effective in the delivery of acute care services at the most appropriate level consistent with quality standards. (Health Systems Plan at pp. 6–19.)

The goal in this area was recognized as:

> *Goal*: Improve the health of the population in the MAHSA area through an adequately available and accessible acute inpatient care system coordinated in a manner that fosters containment

of health care costs and provides quality of care in a culturally acceptable manner. (Health Systems Plan at pp. 6–19.)

To implement this goal MAHSA established a number of objectives in this area and specified particular methods that could be utilized to achieve each objective. Objective No. 4 seeks to:

*Objective # 4*

Maintain a rate of increase in total expenditures for hospital care services which does not exceed the rate of increase in the medical care services component of the Consumer Price Index. (Health Systems Plan at pp. 6–21.)

As one of the nine methods set forth to meet this goal, Mid-America Health System suggested:

(6) Third party payors and the hospital community should work together to develop uniform reporting systems and procedures such that meaningful hospital-to-hospital and year-to-year hospital cost and service-by-service utilization comparisons can be made. (Health Systems Plan at pp. 6–22.)

The certificate of need requirement voluntarily adopted by Blue Cross of Kansas City seems to be authorized by the Act as well as the implementation plan of MAHSA.

In determining if an exemption to the antitrust laws can be implied, courts have distinguished two types of exemptions—specific and blanket. A specific repeal of the antitrust laws implies an exemption only for particular conduct or activity. An exemption for an entire legislative scheme would be a blanket exemption. Courts that have upheld claims of implied repeal have normally limited this repeal to the specific conduct challenged in that particular case; however, in the circumstances of this case defendant's claim is that the entire concept of the National Health Planning and Resource Development Act presupposes non-application of the antitrust laws so that any activity authorized and within the scope of that Act is free from antitrust challenges. The proper issue in this case

then is whether there is a plain repugnancy between the scope of the National Health Care Planning and Development Act and the antitrust laws. Another formulation of this same test of somewhat easier application is whether an exemption to the antitrust laws is necessary to make this statutory scheme effective. The Court believes the answer is yes. In the Court's view, voluntary cooperation of the entire health care industry, including third party payors, is essential to the success of the Act.

The National Health Planning and Resource Development Act clearly attempted to set forth health care goals and a regional administrative framework within which achievement of these goals could be sought through cooperation and voluntary compliance with the health care industry. If the Court were to find that private business working in conjunction with the health system agency established by the Act in their area to achieve the goals of the Act were liable or might be liable under the antitrust laws for their action, then the Court believes that the accomplishment of the purpose of the goals of the Act would be effectively foreclosed.

Having determined that a conflict exists, the Court must consider the method for resolving the discrepancy. The entire concept of the Act as well as the legislative history convinces the Court that the antitrust laws were not intended to apply to members of the health care industry clearly acting within the scope of the Act. In essence the antitrust laws posit that the public interest will be served best when business enterprises are compelled to compete in markets free of anti-competitive restraints. See *Essential Communication v. American Telephone & Telegraph*, 446 F.Supp. 1090 (D.N.J.1978). The concern of the Senate Committee that considered the health care legislation at issue here was the failure of the health care industry to "respond to classic marketplace forces." See Volume 4, U.S.Code Cong. & Admin.News at p. 7878, U.S.Code Cong. & Admin.News 1974, p. 7878. In the Committee's view:

The highly technical nature of medical services together with the growth of third party reimbursement mechanisms act to attenuate the usual forces influencing the behavior of consumers with respect to personal health services. For the most part, the doctor makes purchasing decisions on behalf of the patient and the services are frequently reimbursed under health insurance programs, thus reducing the patient's immediate incentive to contain expenditures. Volume 4, U.S.Code Cong. & Admin.News at p. 7878.

The Committee expressed concern over increasing hospital costs and improper utilization of existing facilities. Volume 4, U.S. Code Cong. & Admin.News at pp. 7893–4. The Committee in fact stated:

The recent rapid acceleration in the costs of personal health services, far outstripping the rate of inflation in other sectors of the economy, has caused the Committee great concern. Although recognizing the increase in costs experienced by health care providers attributable to general inflation, the Committee wishes to express its concern with respect to the disproportionately high rate of increase in costs of health care services. Volume 4, U.S.Code Cong. & Admin. News at p. 7895.

The Committee attributed many of the cost and duplication problems in the health care industry to reimbursement programs like the ones these defendants sponsor. The legislative history indicates to this Court that any attempts by companies such as these defendants to reduce costs and duplication were to be welcomed and were considered essential to a successful program of cost reduction. In summarizing the Act, the Committee stressed:

The long-range goal plan is expected to provide for the prevention of unnecessary duplication of resources and assure that quality health services will be available and accessible in a manner which assures continuity of care at reasonable costs for all residents of the area, and which is responsive to the needs and resources of

the area. U.S.Code Cong. & Admin.News at p. 7887.

Further, the Committee indicated:

A health planning agency is directed to seek to implement its long-range goal plan and short-term priorities plan with the assistance of individuals and public and private entities in its health area. In so doing, the agency is directed to provide technical assistance, to the extent practicable, to such entities in bringing about consistency with its health plan. Volume 4, U.S.Code Cong. & Admin.News at p. 7888.

This interpretation of the legislative history is further supported by Representative Paul Rogers in debates over subsequent amendments to this Act. Representative Rogers expressed concern over interpretations of the National Health Planning and Resource Development Act of 1974:

Concern has been expressed that HSA's and health care providers who voluntarily carry out the mandates of the health planning laws (titles XV and XVI of the Public Health Service Act) may be in violation of the antitrust laws.

The antitrust laws prohibit actions which have the effect of restraining trade or competition. We have found, however, that there is minimal price competition within some parts of the health sector and that often the only competition is around the provision of services. One undesirable result of service competition has been that hospitals and other health care providers have acquired duplicative and expensive equipment and facilities which have led to higher costs for the consumer. In enacting Public Law 93–641, which added titles XV and XVI to the Public Health Service Act, the Congress made a specific judgment that control of the development of health care facilities was needed even though price and service competition might be restrained, and created a health planning system that could promote the efficient use of health resources through the regulation of and voluntary action by providers.

Title XV requires HSA's to bring together both consumers and providers to plan for an efficient health care system that will meet the area's needs. The HSA governing body is to make decisions in its health systems plan and in appropriateness [sic] review recommendations that affect market allocation . . . In doing so, the HSA may develop institution-specific recommendations; . . or develop broader recommendations, such as, three cardiac catheterization laboratories in the area should be consolidated. In either case, it is congressional intent that providers and consumers work together in cooperation with the HSA to determine how best to carry out such recommendations. Without the voluntary cooperation of providers, the provision of title XV dealing with the development of a plan and the review of existing institutional health services could not be carried out.

. . . congressional intent was for the HSA, the provider seeking the certificate of need and other providers which might seek to provide similar services to coordinate their activities to assure that new institutional health services are developed in accordance with the health systems plan for the area.

Although Public Law 93–641 contains no specific exemption from the antitrust laws, an analysis of the activities required of HSA's and providers indicates that Congress sanctioned actions which might otherwise be in violation of our antitrust laws. The intent of Congress was that HSA's and providers who voluntarily work with them in carrying out the HSA's statutory mandate should not be subject to the antitrust laws. If they were, Public Law 93–641 simply could not be implemented. Congressional Record—House, No. 18 Part 1, p. H11962–H11963. A review of the Act and its legislative history compels this Court to concur with Representative Rogers' analysis of congressional intent in enacting the National Health Planning and Resource Development Act. It should be noted that congressional failure to include specific antitrust

exemptions for the activities challenged in this case may in part be accounted for by the status of the case law in 1974. The majority of courts confronted with the issue at that time had held that third party reimbursement contracts came within already existing statutory exemptions under the McCarran-Ferguson Act. The fact that this exemption no longer applies in the instant case does not detract from the clear Congressional intent that activities in the health care area to reduce cost and eliminate duplication would not be subject to challenge under the antitrust statutes.

The defendants in support of their claim of implied repeal cite the March 2, 1979 decision of the United States District Court for the Eastern District of Michigan in *Port Huron Valley Hospital, Inc. v. City of Pontiac, et al.,* (attached as Exhibit C to the brief of Blue Cross of Kansas City filed April 9, 1979). A review of Judge Kennedy's opinion in *Port Huron* reveals that the existence of circumstances not present in this case were crucial to the reasoning and outcome there. In *Port Huron* the State of Michigan had adopted certificate of need legislation. Although such legislation is contemplated by the provisions of the National Health Care Planning and Research Development Act, see 42 U.S.C. 300m–1–5, Judge Kennedy's decision relied on the potential conflict between the state regulation and the federal antitrust laws. The Court does not view *Port Huron* as precedent for its decision in this case. However, it recognizes that the creation of an exemption from the antitrust laws where state certificate of need legislation is passed to insure compliance with the federal act and application of the antitrust laws in instances of voluntary compliance with the federal act would be anomalous. Although not essential to the decision, the Court in *Port Huron* did find that the legislative history of the National Health Care Planning & Resource Development Act demonstrated congressional intent to at least partially repeal the antitrust laws. In fact Judge Kennedy found that it was the purpose of the Act to check the competition of the free market in

the health services area. The Court would concur in this assessment of the Act.

On the basis of the factors outlined above, the Court finds: (1) a clear repugnancy exists between the National Health Care Planning & Resource Development Act and the antitrust laws; (2) Congress intended that action taken pursuant to the Act and clearly within the scope of the Act would be exempt from application of the antitrust laws. Therefore, the defendants' motion for summary judgment Counts I through IV on the grounds that the challenged conduct is exempt from the antitrust laws will be granted.

Two other issues were raised by the defendants which the Court will briefly discuss.

### FAILURE TO STATE A CONSPIRACY CLAIM

■■■ Defendants characterize the statements concerning the conspiracy as conclusionary and maintain that these allegations are not supported by any allegations of material fact. To maintain a cause of action under § 1 of the Sherman Act a party must set forth the following allegations:

> (1) [T]hat the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy." *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81 (3rd Cir. 1977).

The Eighth Circuit has emphasized that the complaint need not set forth specific facts to support its general allegations. *Great Atl. & Pac. Tea Co. v. Amalgamated Meat Cutters & Butchers Workmen of North American Local No. 88*, 410 F.2d 650, 652 (8th Cir. 1969). The Court finds that judged by these standards the conspiracy allegations are sufficiently detailed to meet the above requirements and the complaint is not subject to dismissal for failure to allege ultimate facts supporting this theory.

The defendants also argued that sufficient facts are not alleged to demonstrate a boycott within the meaning of § 2(b) of the McCarran-Ferguson Act. Even if the business of insurance regulated by the state is involved so that generally the antitrust laws are inapplicable to a particular activity, an exception to this general rule is created by § 2(b) of the McCarran-Ferguson Act for concerted activity constituting a boycott, coercion or intimidation. Defendants had argued that even if the Court found that the business of insurance regulated by the state was involved, this exception mandated application of the antitrust laws. The issue of whether plaintiff has alleged sufficient facts to demonstrate that the boycott provisions of § 2(b) apply need not be reached since the Court finds that the exemption of the McCarran-Ferguson Act for the business of insurance does not apply.

### INTERSTATE COMMERCE REQUIREMENT

Finally the defendants have moved to dismiss the complaint on the grounds that prepaid medical plans offered by not-for-profit corporations are not trade or commerce within the meaning of the Sherman Act. Section 1 of the Sherman Act provides in part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . .

■■■ Restraint of trade or commerce is within the prohibition of the commerce requirement only if that restraint affects trade or commerce among the several states or with foreign nations. This effect on commerce requirement is therefore jurisdictional in nature and may be demonstrated in one of two ways. One formulation of the commerce requirement is the "flow of commerce" or qualitative test wherein the restraint complained of is placed directly on goods or services which are themselves in

the flow of interstate commerce. Secondly, the requisite commerce requirement may be demonstrated by a quantitative test which involves transactions that although wholly intrastate substantially affect the flow of interstate commerce. See Von Kalinowski, 1 Antitrust Laws and Trade Regulations § 501[1]–[3].

Plaintiff's allegations appear to fall under the latter theory. Paragraph 15 of plaintiff's complaint states that National Gerimedical is one of the first hospitals in the United States specializing in health care services for the elderly. As such, it is intended to serve a national constituency through research and the development of improved health care for the aged. Involvement and effect on interstate commerce is alleged to exist because National Gerimedical is intended to service out of state patients, purchase drugs and supplies from out of state sources, receive income and make disbursements from out of state insurance, and receive out of state financing for construction and operation. Plaintiff's complaint further indicates that Blue Cross's denial of participating status will foreclose to plaintiff a significant portion of the health care market thus affecting the services rendered to out of state patients, the ability to purchase from out of state sources, and the utilization of out of state financing and insurance proceeds. While these allegations are not as specific as might be desired, the Court finds that this issue is controlled by the decision in *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). In *Trustees of Rex Hospital* plaintiff contended that defendant, a competing hospital, had conspired to restrain plaintiff's planned expansion of facilities in violation of § 1 and § 2 of the Sherman Act. Although the only contended effects on interstate commerce stemmed from plaintiff's provision of intrastate hospital services, the Court concluded that a substantial effect on interstate commerce had been alleged. The Court ruled:

> The complaint, fairly read, alleges that if respondents and their coconspirators were to succeed in blocking petitioner's

planned expansion, petitioner's purchases of out-of-state medicines and supplies as well as its revenues from out-of-state insurance companies would be thousands and perhaps hundreds of thousands of dollars less than they would otherwise be. Similarly, the management fees that petitioner pays to its out-of-state parent corporation would be less if the expansion were blocked. Moreover, the multimillion-dollar financing for the expansion, a large portion of which would be from out of State, would simply not take place if the respondents succeeded in their alleged scheme. This combination of factors is certainly sufficient to establish a "substantial effect" on interstate commerce under the Act. *Trustees of Rex Hospital,* supra, 425 U.S. at 744, 96 S.Ct. at 1852, 48 L.Ed.2d at 343–4.

In reaching this decision the Court rejected an argument that the conduct is outside the scope of the Sherman Act because the effect on commerce is indirect and the conduct producing the effect not purposefully directed toward interstate commerce. Additionally, the Court found that an effect on commerce may be substantial under the Sherman Act even if its impact on interstate commerce falls far short of causing enterprises to fold or affecting market prices. In the final analysis, allegations that:

> . . . fairly claim that the alleged conspiracy, to the extent it is successful, will place "unreasonable burdens on the free and uninterrupted flow" of interstate commerce, they are wholly adequate to state a claim. *Trustees of Rex Hospital,* supra, 425 U.S. at 746, 96 S.Ct. at 1853, 48 L.Ed.2d at 345.

Defendants argue that prepaid medical plans are not trade or commerce and rely on *United States v. Oregon State Medical Society,* 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1951). In the Court's view, *Oregon State Medical Society* is not controlling in the instant case. In *Oregon State Medical Society* it was alleged that the state medical association and local medical organizations had agreed not to compete in particular

areas in offering their prepaid medical plans. The Court found that the sale of medical services through these prepaid plans was not trade or commerce. The challenged conduct here involves contracts or potential contracts between Blue Cross and the supplier of actual hospital services. Plaintiff's claim that the action complained of will affect the ability of National Gerimedical to provide the desired hospital services is indistinguishable from the effect that plaintiff's action was alleged to have caused in *Trustees of Rex Hospital.*

For the above reasons, the Court believes the allegations of the complaint establish that failure to obtain status as a "participating hospital" will have an effect on interstate commerce. Therefore, the defendants' motions for summary judgment on the grounds that the requisite effect on trade or commerce has not been alleged will be denied.

## PENDENT STATE CLAIMS

Having determined that dismissal of Counts I through IV is appropriate, the Court must decide whether to retain the pendent state claims encompassed in Counts V through VIII. The Court recognizes that it has the power to decide the state claims. The issue is one of discretion. In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court wrote:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them . . . . Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surefooted reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Gibbs* seemed to mandate dismissal of state claims where the federal claims were dismissed prior to trial. However, this aspect of *Gibbs* has been relaxed by subsequent Supreme Court cases. See *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442, 450–1 (1970).

Considerations of judicial economy, convenience and fairness to the litigants should be the determinative factors in deciding whether the Court should exercise its pendent jurisdiction or dismiss the state claims. See *Gibbs,* supra; *Rosado,* supra; *Blake v. Town of Delaware City,* 441 F.Supp. 1189, 1204–5 (D.Del.1977). If hearings have been held in a case pending before the Court, discovery conducted and substantial work done towards preparing the action for trial, judicial economy might dictate retaining jurisdiction over the state claims. In this case however, no extensive discovery has been conducted on any issue other than the motion to dismiss and pending a ruling on the motion to dismiss, no answer has even been filed. Further, the issues researched and briefed by the parties involve federal claims and no issues under the state claims have yet been addressed by the parties or the court; thus, judicial economy does not mandate the retention of the state law claims in this instance. Further, this is not a case where dismissal of the parties will leave the plaintiff without an adequate state forum. Therefore, fairness does not mandate retention in this case. Additionally, the factual situation set forth in plaintiff's complaint may involve unique applications of the state antitrust laws. The Court believes that state courts should be allowed to consider issues involving state antitrust laws which will undoubtedly be raised for the first time by this case. It is a well established principle that needless decisions of state law should be avoided as a matter of comity and to procure for the parties "a surefooted reading of applicable law". See *Gibbs,* supra; and *Euster v. Pennsylvania State Horse Racing Commission,* 431 F.Supp. 828 (E.D.Pa.1977).

For the above reasons, the Court believes that a proper exercise of its discretion necessitates dismissal of the pendent state claims.

For all of the reasons outlined above, it is hereby

ORDERED that defendants' motion to dismiss which has been treated as a motion for summary judgment is hereby granted and summary judgment is entered in favor of defendants and against plaintiff on Counts I through IV of plaintiff's complaint; and it is further

ORDERED that in the exercise of its discretion, the pendent state claims set forth in Counts V through VIII are also dismissed without prejudice.