NATIONAL GERIMEDICAL HOSPITAL
AND GERONTOLOGY
CENTER, Appellant,

v.

BLUE CROSS OF KANSAS CITY, Blue
Cross Association, Appellees.

No. 79–2018.

United States Court of Appeals,
Eighth Circuit.

Submitted April 15, 1980.

Decided July 22, 1980.

Rehearing and Rehearing Denied
Aug. 22, 1980.

James M. Beck (argued), and Steven M. Leigh, Kansas City, Mo., on brief, for appellant.

Harry P. Thomson, Jr. (on brief), Shughart, Thomson & Kilroy, Kansas City, Mo., for Blue Cross of Kansas City, appellee; Dennis D. Palmer, Jennifer A. Gille, and Max O. Bagby, Bagby, Winger & Jacob, Kansas City, Mo., on brief.

John C. Noonan (on brief), Kansas City, Mo., for appellee, Blue Cross Assoc.; Randall E. Hendricks, Kansas City, Mo., Joshua F. Greenberg, New York City, and George Heitler, Joel E. Gimpel and Barbara Mayers, Blue Cross Ass'n, Chicago, Ill., on brief.

Carl Weissburg, J. Mark Waxman, Lenard Pick and Thomas H. Mabie, Los Angeles, Cal., and Donald I. Baker, Joe Sims, William E. Swope, and Tom D. Smith, Washington, D. C., on brief, for amicus, Federation of American Hospitals.

Deborah M. Schechter, Washington, D. C., on brief, for amicus, American Health Planning.

Before STEPHENSON and McMILLIAN, Circuit Judges, and SACHS,* District Judge.

STEPHENSON, Circuit Judge.

The National Gerimedical Hospital, plaintiff-appellant, appeals from a summary judgment granted to defendant-appellee Blue Cross of Kansas City. National had charged Blue Cross and others [1] with violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The trial court [2] found Blue Cross' activities to be taken pursuant to Public Law 93–641, the National Health Care Planning and Resources Development Act of 1974, 42 U.S.C. § 300k, *et seq.*; that there was a repugnancy between the Act and the antitrust laws; and that consequently, under the doctrine of implied immunity, Blue Cross' activities were immune from the antitrust laws. *National Gerimedical Hospital & Gerontology Center v. Blue Cross*, 479 F.Supp. 1012 (W.D.Mo. 1979). We affirm the district court.

I. Statutory Background

The related health care statutes, as they existed during the relevant time period, are as follows.

Prior to the National Health Care Planning and Resources Development Act of 1974, the Public Health Service Act, 42 U.S.C. § 291, *et seq.* (known as the Hill-Burton Act) was the primary legislation channeling federal funds to states in support of construction and modernization of health care facilities. The Hill-Burton Act provides, as does much federal legislation involving state cooperation, for voluntary participation by the states. The participating state submits a state plan to HEW, which designates a particular state agency to be in charge of administering the state program and determining, *inter alia*, the need for new or expanded health care facilities. While an applicant could build without approval by the state agency, such applicant would not be eligible for reimbursement by the federal government. *Lakeside Mercy Hospital, Inc. v. Indiana State Board of Health*, 421 F.Supp. 193, 196–97 (N.D. Ind.1976).

Other prior legislation providing for channeling federal funds into health care programs includes the Public Health Service Act § 314, 42 U.S.C. § 246 (amended 1978 and 1979). Under this program, federal funds are channeled to participating states that submit, and have approved by

---

* The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, sitting by designation.

1. Blue Cross of Kansas City and Blue Cross Association were named defendant coconspirators. There were several non-defendant coconspirators listed in the plaintiff's complaint, including Mid-America Health Systems Agency, Inc. (MAHSA).

2. The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri.

HEW, a Comprehensive Health Planning State Plan. This legislation provides for a state agency to be designated to screen health care applications in order to verify the need for new facilities and programs under the approved state plan, and also, in cooperation with the state agency, the Act provides for Area Comprehensive Health Planning Agencies. *Id.* at 197.

Section 1122 of the Social Security Act, 42 U.S.C. § 1320a–1 (amended 1978 and 1979), enacted in 1972, provides for a participating state program for repayment provisions for Medicaid and Medicare, for which repayment prior to that time had not been dependent upon need approval by any of the various state health agencies (those designated by the state pursuant to compliance with federal requirements in order to be a participating state.) Section 1122 of the Social Security Act authorizes HEW to enter into agreements with participating states whereby a state agency is designated as a health planning agency. This agency develops a state plan and makes recommendations as to the need of proposed expenditures for health care facilities, in conformity with regulations promulgated by HEW. Once final approval by HEW is received, the capital expenditure qualifies for purposes of reimbursement, via Medicaid and Medicare payments, the portion of fees allocable to return of depreciation, debt service and other capital related expenditures. *Id.*

The purpose of the National Health Care Planning and Resources Development Act of 1974, also providing for a participating state program, is "to facilitate the development of recommendations for a national health planning policy, to augment area-wide and State planning for health services, manpower, and facilities, and to authorize financial assistance for the development of resources to further that policy." 42 U.S.C. § 300k(b).

Part B of the Act, 42 U.S.C. § 300*l* et seq., provides for the establishment of health service areas and corresponding health systems agencies (HSAs). The purposes of the HSAs as stated in the Act include, *inter alia*, "preventing unnecessary duplication of health resources." 42 U.S.C. § 300*l*–2(a). In order to accomplish its purposes, the HSA is to establish a health systems plan (HSP) and an annual implementation plan (AIP) which will achieve the goals of the HSP. 42 U.S.C. § 300*l*–2(b)(2). The Act specifically provides that the HSA shall implement the HSP and AIP, and "*shall* seek, to the extent practicable, to implement its HSP and AIP with the assistance of individuals and public and private entities in its health service area." 42 U.S.C. § 300*l*–2(c)(1) (emphasis added). It is this section of the Act upon which the district court primarily rests its finding of antitrust immunity for the actions of Blue Cross.

## II. Facts

Construction of the National Gerimedical Hospital began in August 1976 and was completed in September 1978. On October 4, 1977, National submitted to Blue Cross a request for a member hospital contract. Pursuant to such contracts Blue Cross reimburses individual members the cost of all covered health services received at member hospitals. If health services are received by individual members at non-member hospitals, Blue Cross individual members receive only up to eighty percent of the cost of the covered medical services. Also, for health services received at member hospitals, Blue Cross reimburses or pays the hospital for the services provided its individual members; with a non-member hospital, the reimbursement is paid to the individual member, not to the hospital.

Blue Cross advised National that National must first secure need approval of Mid-America Health Services Agency (MAHSA) in order to be eligible for favorable consideration by Blue Cross for a member hospital contract.

MAHSA, named as a non-defendant alleged coconspirator,[3] is a private not-for-profit Missouri corporation engaged in voluntary health planning. MAHSA was conditionally designated an HSA under the Act

---

3. *See* note 1 *supra*.

and was notified of its designation for the eight county bi-state region of the metropolitan Kansas City area by letter from HEW on April 7, 1976. *Mid-America Regional Council v. Mathews*, 416 F.Supp. 896, 899 (W.D.Mo.1976). Thus during the relevant time period of this case, MAHSA enjoyed this status.

Prior to this time period, Missouri had participated in the Social Security Act § 1122 Capital Health Care Expenditures Program, which included a State Planning Agency that performed section 1122 program reviews, as discussed *infra*. 42 U.S.C. § 1320a–1 (amended 1978 and 1979). Blue Cross had required that large capital expenditures be approved by the local and regional planning arm of the section 1122 State Planning Agency before, *i. e.*, a hospital could be a member institute. This Capital Expenditure Program, as discussed *infra*, was designed to assure that federal funds appropriated for Medicaid and Medicare were not used to support unnecessary capital expenditures for health care facilities.

Area agencies established under 42 U.S.C. § 246 (amended 1978 and 1979), discussed *infra*, Area Comprehensive Health Planning Agencies (CHPs), were used in conjunction with the need approvals necessary under 42 U.S.C. § 1320a–1 (amended 1978 and 1979). The applicant for Medicaid and Medicare cost reimbursement had to seek a favorable recommendation from the CHP and secure a favorable determination of need from the state planning agency, the Missouri State Health Planning and Development Agency. The CHP for Missouri was MAHSA. The National Health Planning and Resources Development Act of 1974 gives preference to § 246 area agencies, CHPs and existing regional planning areas. 42 U.S.C. § 300*l*–4(b)(4) and § 300*l*(a)(4).

On June 30, 1976, Missouri, a participating state under 42 U.S.C. § 1320a–1 (amended 1978 and 1979) since 1973, refused to renew Missouri's contract with HEW and Missouri's Program for Capital Health Care Expenditures was terminated.

On July 21, 1976, as reflected by a "Special Newsletter" to Blue Cross member hospitals in Missouri, Blue Cross gave notice that all projects in the Kansas City metropolitan area not reviewed and approved by MAHSA would not be reimbursable by Blue Cross of Kansas City.

Blue Cross of Kansas City has been observing with considerable interest the events regarding the State of Missouri's cancellation of the SSA–1122 Capital Expenditure Program. It appears at this time that the final position of the Department of Health, Education, and Welfare on this matter has not been clarified with respect to reimbursement sanctions.[4] It also appears that the State of Missouri has no intention of reinstating the State Comprehensive Health Planning Agency to perform the SSA–1122 program review.

In view of this action, the Provider Relations Committee of the Blue Cross Board of Trustees felt it necessary to advise all Missouri Member Hospitals of our position on this matter. As you are aware, the Member Hospital Contract contains a provision that capital expenditures of over $350,000 or 5% of the hospital's operating expense in the most recent fiscal year, whichever is lesser, be approved by the local or regional planning agency. Since the State Planning Agency no longer exists, Blue Cross of Kansas City will look to the local Health Systems Agency for approval of such capital projects. That Health Systems Agency in the Kansas City metropolitan area is the Mid-America Health Systems Agency and in the balance of our operating area, Area II Health Systems Agency. *All projects not reviewed and approved by these Health Systems Agencies will not be reimbursable by Blue Cross of Kansas City.*

Therefore, we urge you to continue working with these agencies and Blue Cross of

---

4. Appellant advises us that no question has been raised concerning Hospital's entitlement to full Medicare reimbursement.

Kansas City in future planning needs for your hospital. Should you have any questions regarding our position on this matter, please do not hesitate to consult with us.

MAHSA was, of course, designated as the HSA under the Act. However, Missouri, during the relevant time period, had no law implementing the Act in Missouri nor designating any state agency thereunder·in accordance with 42 U.S.C. § 300m.

MAHSA had publicly stated that it would disapprove and not consider favorably the addition of any acute care hospital beds; acute care hospital beds are the type National provided; National did not submit an application for need review to MAHSA; National's application for a member contract with Blue Cross was denied in March 1978 by Blue Cross because National had not received approval through the voluntary health planning process as required by the Special Newsletter. National then filed this lawsuit.

### III. Analysis

■ National argues that by requiring National to get need approval from MAHSA before it applies for a member hospital contract with Blue Cross, Blue Cross violates the antitrust laws. National contends that the requirement constitutes a contract, combination or conspiracy in restraint of trade, Sherman Act § 1, 15 U.S.C. § 1, and an abuse of Blue Cross' monopoly power in the private health care reimbursement plan market, Sherman Act §·2, 15 U.S.C. § 2.

What defeats National's otherwise appealing argument are the specific provisions of the National Health Planning Resources Development Act for voluntary cooperation and assistance of private entities and persons in the community and health care market. While the doctrine of implied immunity is to be used sparingly and only when necessary, *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), these provisions make the instant situation one well-suited for its use.

■ The necessity of application of the doctrine of implied immunity arises if there is (1) a clear repugnancy between the antitrust laws and the specific conduct at issue and (2) if the intent of Congress is that implied repeal of the antitrust laws was intended. *Essential Communication Systems, Inc. v. AT&T*, 446 F.Supp. 1090, 1094–95 (D.N.J.1978), *rev'd*, 610 F.2d 1114 (3d Cir. 1979) (holding no implied immunity).

As to the first prerequisite, the district court herein stated its finding of repugnancy best when it stated:

If the Court were to find that private business working in conjunction with the health systems agency established by the Act in their area to achieve the goals·of the Act were liable or might be liable under the antitrust laws for their action, then \* \* \* the accomplishment of the purpose of the goals of the Act would be effectively foreclosed.

*National Gerimedical Hospital & Gerontology Center v. Blue Cross, supra*, 479 F.Supp. 1012, 1021 (W.D.Mo.1979).

■ National's emphasis upon the fact that Missouri was not a participating state —"at all times here pertinent, Missouri had no law implementing P.L. 93–641 in Missouri nor designating any state agency thereunder in accordance with 42 U.S.C. § 300m" (brief for appellant at 12–13)—misses the focus of the doctrine of implied immunity. The doctrine should not be confused with the state action exemption to the antitrust laws as articulated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 37 L.Ed. 315 (1943). The doctrine of implied immunity, in fact, is actually a subspecie of implied statutory repeal. *See, Gordon v. N. Y. Stock Exchange*, 422 U.S. 659, 682, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), and *U. S. v. Southern Motor Carriers Rate Conference*, 439 F.Supp. 29, 35 (N.D.Georgia, 1977). It is one of several distinct judicially created rules, which include "primary jurisdiction" and "exhaustion of administrative remedies", designed to resolve potential conflicts between two regimes with federal statutory authorization to regulate the conduct of business

entities: federal administrative agencies and federal courts enforcing (among others) the antitrust laws.

The antitrust laws posit that the public interest is best served when business enterprises are compelled to compete in markets free of anti-competitive restraints. In contrast, the basic premise of administrative regulation is that the freedom of business entities must be in some degree curtailed to maximize the general welfare. When the same conduct falls within the scope of both the antitrust laws and a regulatory scheme, potential conflicts of competency and policy are resolved under the doctrine of implied immunity.

*Essential Communication Systems, Inc. v. AT&T, supra,* 446 F.Supp. at 1094 (footnote omitted). Missouri's lack of state participation did not affect the Act which set up a regulatory scheme which designated MAHSA as a regulatory need review agency. More specifically, it has no effect upon that portion of the legislation which calls for a regulatory system which included the designated HSA implementing the HSP and AIP "with the assistance of individuals and public and private entities in its health service area." 42 U.S.C. § 300*l*–2(c)(1).

The extent of this regulatory scheme is demonstrated by the district court's discussion.

Mid-America Health Systems Agency was one of 205 regional health systems agencies established under the Act * *. In November of 1977 Mid-America Health Systems established a health systems plan for 1978 through 1982 in this region. Increasing hospital costs and unnecessary duplication of facilities and equipment were considered two of the biggest problems in this region. The health systems plan adopted by Mid-America Health Systems recognized:

Problem—The acute inpatient care system does not function in a coordinated manner which is cost-effective in the delivery of acute care services at the most appropriate level consistent with quality standards. (Health Systems Plan at pp. 6–19.)

The goal in this area was recognized as:

Goal: Improve the health of the population in the MAHSA area through an adequately available and accessible acute inpatient care system coordinated in a manner that fosters containment of health care costs and provides quality of care in a culturally acceptable manner. (Health Systems Plan at pp. 6–19.)

To implement this goal MAHSA established a number of objectives in this area and specified particular methods that could be utilized to achieve each objective. Objective No. 4 seeks to:

*Objective # 4*

Maintain a rate of increase in total expenditures for hospital care services which does not exceed the rate of increase in the medical care services component of the Consumer Price Index. (Health Systems Plan at pp. 6–21.)

As one of the nine methods set forth to meet this goal, Mid-America Health System suggested:

(6) Third party payors and the hospital community should work together to develop uniform reporting systems and procedures such that meaningful hospital-to-hospital and year-to-year hospital cost and service-by-service utilization comparisons can be made. (Health Systems Plan at pp. 6–22.)

*National Gerimedical Hospital & Gerontology Center v. Blue Cross, supra,* 479 F.Supp. at 1020–21. Implied immunity can be found in "particular and discrete instances to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts exercising jurisdiction under the antitrust laws." *United States v. National Association of Securities Dealers, Inc.,* 422 U.S. 694, 734, 95 S.Ct. 2427, 2450, 45 L.Ed.2d 486 (1975).

We agree with the district court's finding of clear repugnancy between the Act and the antitrust laws, as the Act and regulatory scheme clearly call for the action which

has now become the basis of an antitrust claim.

We now examine the history of the Act in order to determine the congressional intent in regard to immunity. The district court concluded, after a thorough review of the legislative history, that it was the intent of Congress to immunize this type of voluntary action from the antitrust laws. We cannot improve on the district court's discussion:

> In essence the antitrust laws posit that the public interest will be served best when business enterprises are compelled to compete in markets free of anti-competitive restraints. * * * The concern of the Senate Committee that considered the health care legislation at issue here was the failure of the health care industry to "respond to classic marketplace forces." See Volume 4, U.S.Code Cong. & Admin.News at p. 7878, U.S.Code Cong. & Admin.News 1974, p. 7878. In the Committee's view:

> > The highly technical nature of medical services together with the growth of third party reimbursement mechanisms act to attenuate the usual forces influencing the behavior of consumers with respect to personal health services. For the most part, the doctor makes purchasing decisions on behalf of the patient and the services are frequently reimbursed under health insurance programs, thus reducing the patient's immediate incentive to contain expenditures. Volume 4, U.S.Code Cong. & Admin.News at p. 7878.

> The Committee expressed concern over increasing hospital costs and improper utilization of existing facilities. Volume 4, U.S.Code Cong. & Admin.News at pp. 7893–4. The Committee in fact stated:

> > The recent rapid acceleration in the costs of personal health services, far outstripping the rate of inflation in other sectors of the economy, has caused the Committee great concern. Although recognizing the increase in costs experienced by health care providers attributable to general inflation,

> > the Committee wishes to express its concern with respect to the disproportionately high rate of increase in costs of health care services. Volume 4, U.S. Code Cong. & Admin.News at p. 7895.

> The Committee attributed many of the cost and duplication problems in the health care industry to reimbursement programs like the ones these defendants sponsor. The legislative history indicates to this Court that any attempts by companies such as these defendants to reduce costs and duplication were to be welcomed and were considered essential to a successful program of cost reduction. In summarizing the Act, the Committee stressed:

> > The long-range goal plan is expected to provide for the prevention of unnecessary duplication of resources and assure that quality health services will be available and accessible in a manner which assures continuity of care at reasonable costs for all residents of the area, and which is responsive to the needs and resources of the area. U.S. Code Cong. & Admin.News at p. 7887.

> Further, the Committee indicated:

> > A health planning agency is directed to seek to implement its long-range goal plan and short-term priorities plan with the assistance of individuals and public and private entities in its health area. In so doing, the agency is directed to provide technical assistance, to the extent practicable, to such entities in bringing about consistency with its health plan. Volume 4, U.S.Code Cong. & Admin.News at p. 7888.

> This interpretation of the legislative history is further supported by Representative Paul Rogers in debates over subsequent amendments to this Act. Representative Rogers expressed concern over interpretations of the National Health Planning and Resource Development Act of 1974:

> Concern has been expressed that HSA's and health care providers who voluntarily carry out the mandates of the health planning laws (titles XV and XVI of the

Public Health Service Act) may be in violation of the antitrust laws.

The antitrust laws prohibit actions which have the effect of restraining trade or competition. We have found, however, that there is minimal price competition within some parts of the health sector and that often the only competition is around the provision of services. One undesirable result of service competition has been that hospitals and other health care providers have acquired duplicative and expensive equipment and facilities which have led to higher costs for the consumer. In enacting Public Law 93–641, which added titles XV and XVI to the Public Health Services Act, the Congress made a specific judgment that control of the development of health care facilities was needed even though price and service competition might be restrained, and created a health planning system that could promote the efficient use of health resources through the regulation of and voluntary action by providers.

Title XV requires HSA's to bring together both consumers and providers to plan for an efficient health care system that will meet the area's needs. The HSA governing body is to make decisions in its health systems plan and in appropriateness [sic] review recommendations that affect market allocation . . . In doing so, the HSA may develop institution-specific recommendations; . . . or develop broader recommendations such as, three cardiac catheterization laboratories in the area should be consolidated. In either case, it is congressional intent that providers and consumers work together in cooperation with the HSA to determine how best to carry out such recommendations. Without the voluntary cooperation of providers, the provision of title XV dealing with the development of a plan and the review of existing institutional health services could not be carried out.

. . . congressional intent was for the HSA, the provider seeking the certificate of need and other providers which might seek to provide similar services to coordinate their activities to assure that new institutional health services are developed in accordance with the health systems plan for the area.

Although Public Law 93–641 contains no specific exemption from the antitrust laws, an analysis of the activities required of HSA's and providers indicates that Congress sanctioned actions which might otherwise be in violation of our antitrust laws. The intent of Congress was that HSA's and providers who voluntarily work with them in carrying out the HSA's statutory mandate should not be subject to the antitrust laws. If they were, Public Law 93–641 simply could not be implemented. Congressional Record—House, No. 18 Part 1, p. H11962–H11963.

*National Gerimedical Hospital & Gerontology Center v. Blue Cross, supra*, 479 F.Supp. at 1021–23.

We adopt the district court's discussion, as set out above. We affirm the district court's holding; the doctrine of implied immunity applies to Blue Cross' voluntary cooperation with the congressionally designated HSA in requiring National to obtain need approval from MAHSA prior to applying for a Blue Cross membership contract.

■ Appellee Blue Cross also argues that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–15, exempts the challenged conduct from the federal antitrust laws. We agree, in all respects, with the district court's holding that *Group Life & Health Insurance Co. v. Royal Drug Co., Inc.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (defining "the business of insurance" in connection with the McCarran-Ferguson Act) controls. *National Gerimedical Hospital & Gerontology Center v. Blue Cross, supra*, 479 F.Supp. at 1016–19. Thus, we hold that the McCarran-Ferguson Act insurance exemption is not applicable in this case.

The district court is affirmed.