722 F.2d 59
 1983-2 Trade Cases 65,734
 STATE of North Carolina, ex rel. Rufus L. EDMISTEN, Attorney
General, Appellants,
v.
P.I.A. ASHEVILLE, INC.; First Washington Group, Inc.;
Consolidated Health Systems, Inc.; and
Psychiatric Institutes of America, Inc.,
Appellees.
United States of America, Amicus Curiae.
 No. 82-1058.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 20, 1982.
Decided Nov. 30, 1983.
 
 John R. Corne, Associate Atty. Gen., Raleigh, N.C. (H.A. Cole, Jr., Sp. Deputy Atty. Gen., Raleigh, N.C., on brief), for appellants.
 Joel I. Klein, Washington, D.C. (Robert D. Luskin, Onek, Klein & Farr, Washington, D.C., John S. Stevens, Redmond, Stevens, Loftin & Currie, Asheville, N.C., Martin J. Gaynes, Bonner, Thompson, O'Connell, Gaynes & Middlekauff, Washington, D.C., on brief), for appellees.
 Andrew Limmer, Dept. of Justice, Washington, D.C. (John H. Carley, Gen. Counsel, David M. Narrow, Peter M. Kazon, Bureau of Competition, Federal Trade Commission; William F. Baxter, Asst. Atty. Gen., Barry Grossman, Dept. of Justice, Washington, D.C., on brief), for amicus curiae.
 Before RUSSELL, WIDENER and HALL, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 This case arises out of the acquisition by Psychiatric Institutes of America, Inc. (PIA) of Highland Hospital, a private psychiatric hospital located in Asheville, North Carolina. The Attorney General of North Carolina brought this action against PIA and three related corporations, P.I.A. Asheville, Inc.; First Washington Group, Inc.; and Consolidated Health Systems, Inc., alleging that the defendants' ownership and operation of Highland Hospital and another Asheville psychiatric hospital constitutes a violation of federal and state antitrust laws. This is an appeal by the State from the district court's grant of summary judgment for the defendants on the ground that the acquisition of Highland Hospital was exempt from the antitrust laws.
 
 I.
 
 2
 The facts are undisputed. In December 1979, PIA entered into an agreement to purchase Highland Hospital from Duke University. Subsequently, in January 1980, PIA entered into an agreement to purchase Appalachian Hall Hospital, another psychiatric hospital located in Asheville. Each agreement was conditioned upon PIA obtaining a certificate of need from the North Carolina Department of Human Resources. The certificate of need for the acquisition of Appalachian Hall Hospital was granted on November 30, 1980. On the recommendation of the Western North Carolina Health Systems Agency, the certificate of need for the acquisition of Highland Hospital was initially denied. Upon reconsideration, however, the certificate of need was granted on June 26, 1981.
 
 
 3
 The Attorney General brought this action on February 22, 1980, alleging that PIA's acquisition of Highland Hospital, if consummated, would result in its ownership of all the private psychiatric hospitals within the area served by the Western North Carolina Health Systems Agency. He contended that this ownership would constitute a monopoly in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2, section 7 of the Clayton Act, 15 U.S.C. Sec. 18, and sections 75-1 and 75-2 of the North Carolina General Statutes. The district court stayed the proceedings pending the outcome of the certificate of need applications.
 
 
 4
 After PIA received the certificates of need, the Attorney General proceeded with his antitrust action, and the district court granted summary judgment for the defendants. The court held that antitrust immunity is implied in the regulatory structure established by the National Health Planning and Resources Development Act of 1974 (NHPRDA), 42 U.S.C. Secs. 300k et seq. See, e.g., Gordon v. New York Stock Exchange, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975). It also held in the alternative that the state action doctrine immunizes the defendants from antitrust liability. See, e.g., Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The issue presented on appeal is whether the district court properly applied either of these theories of antitrust immunity. We hold that antitrust immunity for the acquisition of Highland Hospital is implied in the regulatory structure of the NHPRDA, and do not reach the question of whether the state action doctrine also grants immunity.
 
 II.
 
 5
 A determination of the applicability of implied antitrust immunity must begin with an examination of the federal and state regulatory system established by the National Health Planning and Resources Development Act of 1974. Congress enacted the NHPRDA to remedy the problems of rising health care costs and uneven distribution of health care services. 42 U.S.C. Sec. 300k; S.Rep. No. 1285, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 7842, esp. 7878-79 (hereinafter cited as S.Rep. No. 93-1285).[1] Congress found that the health care industry is unresponsive to classic marketplace forces because physicians commonly make purchasing decisions for their patients and the costs generally are reimbursed by a third party, such as medicare, medicaid, or insurance. S.Rep. No. 93-1285, supra, 1974 U.S.Code Cong. & Ad.News at 7878. Through the NHPRDA, Congress sought to establish a coordinated federal and state regulatory structure to promote health care planning and thereby provide broader access to health care services at a lower cost to consumers. Id.
 
 
 6
 To implement the planning process, the Act created a system of state and local planning agencies. Planning at the local level is accomplished through Health Systems Agencies (HSA's). 42 U.S.C. Sec. 300l -2. They must create and implement health care plans responsive to the needs of the community they serve. Id. Sec. 300l -2(a). A state health planning and development agency is responsible for integrating the local plans into a statewide plan and for exercising regulatory power over the planning process. Id. Secs. 300m to 300m-2. Ultimate federal control and coordination of the planning process is achieved through a National Council on Health Planning and Development, id. Sec. 300k-3, and through regulations issued by the Secretary of Health, Education, and Welfare, id. Sec. 300k-1; see 42 C.F.R. Secs. 121.1-124.607 (1981).
 
 
 7
 As originally enacted, the NHPRDA listed as HSA planning goals the general improvement of health, increasing the accessibility of health care services, restraining increases in health care costs, and preventing unnecessary duplication of health care resources. 42 U.S.C. Sec. 300l -2(a)(1) to (4).[2] In 1979, as part of the Health Planning and Resources Development Amendments, Pub.L. No. 96-79, 93 Stat. 592, Congress amended the NHPRDA to require planning bodies to consider the role of competition in the allocation of health care services.[3] See id. Sec. 103, 93 Stat. at 594-95 (codified at 42 U.S.C. Secs. 300k-2(a), (b), 300l -2(a), 300n-1(c)); S.Rep. No. 96, 96th Cong., 1st Sess. 3, reprinted in 1979 U.S.Code Cong. & Ad.News 1306, 1308 (hereinafter cited as S.Rep. No. 96-96). In particular, Congress added to the existing purposes of HSA planning the goal of "preserving and improving ... competition in the health service area." Pub.L. No. 96-79, Sec. 103(c), 93 Stat. at 595 (codified at 42 U.S.C. Sec. 300l -2(a)(5)).[4]
 
 
 8
 In enacting the 1979 amendments, however, Congress restated its view that market forces generally have little effect on restraining health care costs or efficiently allocating health care services. S.Rep. No. 96-96, supra, at 52-53, 1979 U.S.Code Cong. & Ad.News at 1357-58; House Comm. on Interstate and Foreign Commerce, Health Planning and Resources Development Amendments of 1979, H.R.Rep. No. 190, 96th Cong. 1st Sess. 51-52 (1979) (hereinafter cited as H.R.Rep. No. 96-190); see 42 U.S.C. Sec. 300k-2(b)(1). Accordingly, the amendments instructed state planning agencies to promote competition in only those health service areas in which competition allocates supply in accordance with state health care plans. 42 U.S.C. Sec. 300k-2(b)(3). However, "[f]or health services, such as inpatient health services and other institutional health services, for which competition does not appropriately allocate supply," the agencies are to "allocate the supply" rather than leave allocation to market forces. Id. Sec. 300k-2(b)(2).[5]
 
 
 9
 As a part of the planning process, each State must administer a certificate of need program. Id. Sec. 300m-2(a)(4)(B). Such a program generally provides for the review of and determination of need for capital expenditures, offerings of new institutional health services, and acquisitions or major medical equipment. Id. Sec. 300m-6(a). The North Carolina certificate of need law, under which the acquisition of Highland Hospital was reviewed, was, in terms, enacted pursuant to the NHPRDA. See N.C.Gen.Stat. Sec. 131-175(5) (1981).[6]
 
 
 10
 In compliance with the procedures mandated by the NHPRDA, see 42 U.S.C. Sec. 300n-1, the North Carolina statute provides for initial review of certificate of need applications by the local HSA, N.C.Gen.Stat. Sec. 131-182, which in this case was the Western North Carolina Health Systems Agency. The HSA must hold public hearings and allow the submission by interested parties of written comments and other relevant information. Id. The HSA's recommendation is reviewed by the State Department of Human Resources, which renders, along with specific findings of fact, an opinion approving or disapproving the CON application. Id. Secs. 131-182 to -184. Finally, an aggrieved party may seek administrative and judicial review of the CON determination. Id. Sec. 131-185.[7]
 
 III.
 
 11
 The NHPRDA provides no express antitrust immunity for PIA's acquisition of Highland Hospital.[8] PIA claims, however, that implied immunity is clear from both the NHPRDA's regulatory structure and its legislative history.
 
 A.
 
 12
 The Supreme Court has recognized claims of implied antitrust immunity for actions taken within a federally regulated industry. See, e.g., Gordon v. New York Stock Exchange, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); United States v. National Association of Securities Dealers, Inc., 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975); Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). Such implied repeals of the antitrust laws, however, are disfavored. Gordon v. New York Stock Exchange, 422 U.S. at 682, 95 S.Ct. at 2611. A claim of implied antitrust immunity can be upheld only if there is a "plain repugnancy between the antitrust and regulatory provisions." United States v. Philadelphia National Bank, 374 U.S. 321, 351, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963) (footnote omitted); see also Gordon v. New York Stock Exchange, 422 U.S. at 682, 95 S.Ct. at 2611 (quoting United States v. Philadelphia National Bank ). Phrased differently, the court must determine whether an implied repeal of the antitrust laws is " 'necessary to make the [regulatory scheme] work.' " United States v. National Association of Securities Dealers, Inc., 422 U.S. at 734, 95 S.Ct. at 2450 (brackets in original) (quoting Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963)).
 
 
 13
 The Supreme Court was presented with a claim of implied antitrust immunity under the NHPRDA in National Gerimedical Hospital & Gerontology Center v. Blue Cross, 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981). In National Gerimedical, the defendant, Blue Cross, had refused to give the plaintiff hospital participant status because of the hospital's failure to obtain approval for its construction from the local HSA. At the time of construction, however, the State had no certificate of need procedure, and therefore HSA approval was not a requirement of state law. Id. at 389-90 & n. 15, 101 S.Ct. at 2422-23 n. 15.
 
 
 14
 Holding that the facts did not present a clear repugnancy between the provisions of the NHPRDA and the antitrust laws, the Court rejected Blue Cross's claim of implied immunity. The Court found no evidence of Congressional intent to encourage spontaneous private enforcement of what amounted to an "advisory opinion" of an HSA. Id. at 391, 101 S.Ct. at 2423. Most important, the Court said that the lack of regulatory review and approval of Blue Cross's actions was "crucial" to its holding. Id. at 390, 101 S.Ct. at 2422. The opinion cited Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), and Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), as cases in which a lack of regulatory review of the defendants' actions was an important factor in rejecting claims of implied antitrust immunity. 452 U.S. at 390, 101 S.Ct. at 2422. Accordingly, the Court stated:
 
 
 15
 [O]ur holding does not foreclose future claims of antitrust immunity in other factual contexts. Although favoring a reversal in this case, the United States as amicus curiae asserts that "there are some activities that must, by implication, be immune from antitrust attack if HSAs and State Agencies are to exercise their authorized powers."
 
 
 16
 Id. at 393 n. 18, 101 S.Ct. at 2424 n. 18.
 
 
 17
 The importance of regulatory review of the challenged activity was also stressed in Gordon v. New York Stock Exchange, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975). In Gordon, the plaintiff alleged that certain of the defendant's practices, in particular the imposition of fixed commission rates, violated the antitrust laws. Id. at 661, 95 S.Ct. at 2601. The Exchange's claim of implied immunity, however, was upheld. The Court distinguished Silver v. New York Stock Exchange--a case in which the Exchange's claim of implied immunity had been rejected--on the grounds that the practices challenged in Gordon were within the regulatory power granted by the Securities Exchange Act of 1934 to the Securities and Exchange Commission, and the Commission had exercised that power. Id. at 683-85, 95 S.Ct. at 2611-12. The Court concluded that an implied repeal of the antitrust laws was " 'necessary to make the Securities Exchange Act work,' " id. at 685, 95 S.Ct. at 2612 (quoting Silver v. New York Stock Exchange, 373 U.S. at 357, 83 S.Ct. at 1257), because application of the antitrust laws would "unduly interfere ... with the operation of the Securities Exchange Act." Id. 422 U.S. at 685-86, 95 S.Ct. at 2612-13.
 
 
 18
 A review of the facts in the instant case demonstrates that Gordon, rather than National Gerimedical, is controlling. In our case, the acquisition was reviewed and approved by the State Department of Human Resources. This approval was required by the North Carolina certificate of need law, see N.C.Gen.Stat. Secs. 131-176(17)b., -178, which was enacted pursuant to the NHPRDA.
 
 
 19
 On the facts presented here, the NHPRDA and the certificate of need procedure it establishes are clearly repugnant to the antitrust laws. Congress determined that the problems of rising health care costs and uneven distribution of health care services were better remedied by a system of federal and state planning than by unbridled competition. Although Congress found that competition could be beneficial in certain areas of the health care industry, under the NHPRDA planning agencies are to promote competition only when the effects of competition would be consistent with state health care plans. Consequently, state health planning and development agencies are required to consider a number of factors, including competitive effects, in reviewing certificate of need applications. The antitrust laws, however, concern themselves solely with the protection of competition. See Gordon v. New York Stock Exchange, 422 U.S. at 689, 95 S.Ct. at 2614. To allow the application of the antitrust laws to strike down transactions approved by state agencies under a certificate of need program "would unduly interfere with the operation of the [NHPRDA]" and subject participants in the certificate of need process to "conflicting standards." Id. at 686, 689, 95 S.Ct. at 2613, 2614.
 
 
 20
 The Attorney General contends that this case presents no clear repugnancy between the NHPRDA and the antitrust laws because the NHPRDA did not require certificate of need review of the acquisition of Highland Hospital. Although at the time of the transaction North Carolina law required such review of all acquisitions of existing health care facilities, N.C.Gen.Stat. Secs. 131-176(17)b., -178, the federal Act only requires review of such acquisitions if the services or bed capacity of the acquired facility will be changed, or if notice of the acquisition is not timely filed, 42 U.S.C. Sec. 300m-6(d)(1).[9] The record discloses no evidence that any of the conditions enumerated in the federal act occurred in the acquisition of Highland Hospital. However, it is evident from the provisions of the NHPRDA, its legislative history, and the applicable federal regulations that North Carolina's statutory decision to review all acquisitions of existing health care facilities was within the purposes and scope of the Act.
 
 
 21
 Although the NHPRDA is a federal act that imposes uniform national standards, Congress intended that the Act be implemented to fit individual state and community needs. S.Rep. No. 96-96, supra, at 51, 55, 1979 U.S.Code Cong. & Ad.News at 1356, 1360. This intent is manifest in the Act's delegation of planning and CON review power to state and local agencies. Consistent with this policy, Congressional committee reports are clear and explicit that the NHPRDA was not intended to preclude States from adopting more stringent or more comprehensive certificate of need programs than required by the Act. Id. at 43 & n. 2, 75, 1979 U.S.Code Cong. & Ad.News at 1348 & n. 2, 1380; H.R.Conf.Rep. No. 96-420, 96th Cong., 1st Sess., reprinted in 1979 U.S.Code Cong. & Ad.News at 1422, 1453 (hereinafter cited as H.R.Conf.Rep. No. 96-420). States thus may require certificate of need review of "all acquisitions" of health care facilities. H.R.Conf.Rep. No. 96-420, supra, at 85, 1979 U.S.Code Cong. & Ad.News at 1453.[10] The Act in fact recognizes that different States may have differing certificate of need laws by providing additional funds for HSA's that incur extraordinary expenses due to differing certificate of need requirements. 42 U.S.C. Sec. 300l-5(d)(2); S.Rep. No. 96-96, supra, at 70-71, 1979 U.S.Code Cong. & Ad.News at 1375-76.
 
 
 22
 Comments by the Secretary of Health, Education, and Welfare on regulations promulgated pursuant to the Health Planning and Resources Development Amendments of 1979, see 42 U.S.C. Sec. 300m-2(a)(4)(B), provide additional authority for North Carolina's decision to subject all acquisitions of health care facilities to certificate of need review. The regulations concerning such review of hospital acquisitions track the the statutory language. States are required to review only acquisitions that result in a change in services or bed capacity or for which timely notice is not filed. See 45 Fed.Reg. 69,747 (1980) (codified at 42 C.F.R. Sec. 123.404(a)(5)(i) (1981)); 42 U.S.C. Sec. 300m-6(a)(1). In a later comment, the Secretary said that they were intended to give States "substantial flexibility" in the implementation of their certificate of need programs. 45 Fed.Reg. at 69,740. Specifically, the Secretary said that States "are free to exceed the minimum requirements" of the certificate of need regulations except when prohibited, which this one is not. Id. at 69,740, 69,746. And, in commenting on the proposed regulations, which were later adopted, with respect to "acquisitions of existing facilities," the precise point at issue in this case, the Secretary stated:
 
 
 23
 The Secretary notes that States may, if they choose, cover additional (or all) acquisitions of health care facilities, in which case, because a regular certificate of need would be required, a notice of intent would not be required. States might consider extending their coverages to all acquisitions if they believe that acquisitions may be likely to lead to higher health care costs for consumers and third party payors. 45 Fed.Reg. 20,028 (1980).
 
 
 24
 Subjecting mere acquisitions of health care facilities to certificate of need review can further important policies of the NHPRDA. In this case, the North Carolina Department of Human Resources found that, if Highland Hospital had continued charging its pre-acquisition rates, it soon would have been operating at a deficit. The rates proposed by PIA, however, would "have the least possible impact on the [hospital's] costs and charges" while at the same time assuring "immediate and long-term financial feasibility." This furthers the policy of "increasing the accessibility ..., continuity, and quality of health services provided." 42 U.S.C. Sec. 300l -2(a)(2). The department also found that the proposed financing package assured that "minimal financing costs will be incorporated in any future rate increases." This furthers the policy of "restraining increases in the cost of providing ... health services." Id. Sec. 300l -2(a)(3).[11] In requiring review of the acquisition of Highland Hospital, therefore, North Carolina was acting within the scope and purposes of the NHPRDA. Thus, the fact that the federal statute did not require certificate of need review of the acquisition does not affect our holding that the facts of this case present a clear repugnancy between the NHPRDA and the antitrust laws.
 
 B.
 
 25
 Although implied antitrust immunity on the facts presented here is evident from the NHPRDA's regulatory structure alone, the legislative history of the Act provides direct evidence of Congressional intent to exempt from the antitrust laws actions that are subjected to certificate of need review. A statement by Representative Paul Rogers, a sponsor of both the original 1974 Act and the 1979 amendments, makes this intent clear:
 
 
 26
 Although ... [the NHPRDA] contains no specific exemption from the antitrust laws, an analysis of the activities required of HSA's and providers indicates that Congress sanctioned actions which might otherwise be in violation of our antitrust laws. The intent of Congress was that HSA's and providers who voluntarily work with them in carrying out the HSA's statutory mandate should not be subject to the antitrust laws. If they were, [the NHPRDA] simply could not be implemented.
 
 
 27
 124 Cong.Rec. H 11,963 (daily ed. Oct. 10, 1978).[12] Further evidence of Congressional intent to immunize conduct approved under a state certificate of need program is provided in a report by the House Committee on Interstate and Foreign Commerce:
 
 
 28
 While the application of the antitrust laws to promote competition is and should be the general rule, the committee believes that a practical and realistic analysis of the health care industry argues for exceptions to the rule.... Congress required ealth planning agencies to carry out specific functions and established a financial penalty for States which failed to comply with the requirements. Those statutory requirements and penalty indicate that Congress did not expect the antitrust laws to be applied to agency actions, which might otherwise be in violation of the antitrust laws, if those agency actions were necessary to carry out the prescribed functions. On the other hand, however, agency acts which are not necessary to carry out such functions or which are outside the scope of title XV are not authorized and therefore not immune from the application of the antitrust laws.
 
 
 29
 H.R.Rep. No. 96-190, supra, at 54-55 (emphasis in original).
 
 
 30
 The NHPRDA requires state planning agencies to administer a certificate of need program. Therefore, the process of reviewing and approving business transactions that are within the contemplation of the federal certificate of need law is within the scope of the Act and entitled to antitrust immunity. As discussed above, North Carolina's review and approval of the Highland Hospital's acquisition was within the scope of the NHPRDA's certificate of need program, and thus we think Congress intended to immunize the transaction from antitrust liability.
 
 IV.
 
 31
 We cannot summarize the case better than by quoting the Senate Report in 1979, U.S.Code Cong. & Ad.News, where the committee explained the meaning of the statute and analyzed some of its results on pages 1356 and 1357:
 
 
 32
 When we say "improve decisions,["] we mean several things, things that are the very essence of what the health planning program is about:
 
 
 33
 We mean a local decision structure in which every one has an opportunity to participate--indeed it is dependent upon the effective participation of citizen volunteers;
 
 
 34
 We mean decisions that are made within the framework of a community-wide and community-developed long-range plan for sensible investment decisions;
 
 
 35
 We mean a plan that recognizes real constraints on resources--a reality-based plan that will not condone every added expenditure desired by every hospital and every physician;
 
 
 36
 We mean a program which keeps most regulatory powers needed to enforce the plan in the hands of State government, not the Federal Government.
 
 
 37
 One might then ask: What has that improved decisionmaking process accomplished? Although the health planning agencies were established and "conditionally designated" by the HEW Secretary less than 3 years ago, it is now becoming possible to see the results of their efforts.
 
 
 38
 A recent survey of the planning agencies' performance in reviewing new capital investment projects covered the 2-year period from the summer of 1976 to the summer of 1978. The first report of that survey, which analyzed data on the first 139 health systems agencies surveyed, provides some interesting statistics:
 
 
 39
 These 139 HSA's, which cover about 60 percent of the population of the country, reviewed more than $7 billion in proposed capital investments, in spite of the fact that many of these agencies did not begin such review until 1977.
 
 
 40
 Of that $7 billion, one quarter was deemed unnecessary and was not allowed to go forward. In other words, more than $1.8 of unneeded capital investment expenditures was prevented.
 
 
 41
 Pitting the cost of these HSA's and the relevant State agencies against the result, we find that for each dollar spent on health planning, $8 in proposed capital investments were denied--an impressive rate of return indeed.
 
 
 42
 If we further consider the operational costs that will not now be incurred in conjunction with $1.8 billion of unneeded capital projects, the savings are magnified many times again. For we know that annual operating costs approximate 50 percent of the capital costs.
 
 
 43
 It should be noted that these savings have occurred in the absence of any supportable claim that the quality of health care has suffered in any way.
 
 
 44
 Thus, the legislative history clearly indicates that the Congressional purpose of the enactment of the statute was a national plan of health care, and the carrying out of this national plan has been shown to be successful. The permissible state regulation of the acquisition of health care facilities under the national health plan is inconsistent with its regulation under the antitrust laws. We think "antitrust immunity is 'necessary to make the [NHPRDA] work' ". National Gerimedical, at p. 393, n. 18, 101 S.Ct. at 2424, n. 18.
 
 
 45
 In conclusion, we hold that the NHPRDA provides implied immunity from the federal antitrust laws for the defendants' acquisition[13] of Highland Hospital. Such immunity is evident from both the regulatory structure of the Act and its legislative history. The federal law claims must therefore be dismissed, and under United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), the pendent state law claims were properly dismissed also.
 
 
 46
 AFFIRMED.
 
 DONALD RUSSELL, Circuit Judge, dissenting:
 
 47
 The majority finds that immunity from the federal antitrust laws may be, and here is, implicit in a statute, the National Health Planning and Resources Development Act of 1974 (hereafter NHPRDA), 42 U.S.C. Secs. 300k et seq., amended by 42 U.S.C. Sec. 300k-2. Upon this basis the majority upholds the district court. I find that a grant of antitrust immunity may not be inferred from the NHPRDA absent an express provision therefor. Since the NHPRDA contains no such provision, I cannot agree with the majority.
 
 
 48
 The district court found as an alternative basis for its grant of summary judgment that the defendants were immunized from liability by the state action doctrine, as expressed in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The majority did not reach this issue; neither do I.
 
 
 49
 My reasons for dissenting are, briefly: Implied repeals in the antitrust field have been strongly disfavored for over forty years, ever since United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). This is not to say that no implied repeal may ever be found; the Supreme Court has recognized that "there are some activities that must, by implication, be immune from antitrust attack if HSA's and state agencies are to exercise their authorized powers," National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City, 452 U.S. at 393 n. 18, 101 S.Ct. at 2424 n. 18. However, for immunity from federal antitrust laws to be implied by a statute, there must be a "plain repugnancy" between the requirements of the statute and those of the antitrust laws, United States v. Philadelphia National Bank, 374 U.S. at 351, 83 S.Ct. at 1734, and even then, the antitrust laws may be repealed only to the "minimum extent necessary" to obviate the clear repugnancy, Silver v. New York Stock Exchange, 373 U.S. at 357, 83 S.Ct. at 1257.
 
 
 50
 As a general rule, the Supreme Court has recognized a statute as repealing the antitrust laws by implication only where the statute provided ongoing government supervision as a substitute for antitrust scrutiny. Cf., United States v. Philadelphia National Bank, 374 U.S. at 351-52, 83 S.Ct. at 1734-35 (no ongoing supervision, so no exemption), with Gordon v. New York Stock Exchange, 422 U.S. at 689-90 n. 14, 95 S.Ct. at 2614-15 n. 14, (SEC had ongoing supervision, so exemption found).
 
 
 51
 The NHPRDA, as implemented by North Carolina's enabling legislation,[1] does give the state agency, the HSA, the power to scrutinize certain acquisitions and expenditures through "certificate of need" (hereafter CON) review. In exercising such power, the state agency provides for public comment and a hearing, and it requires that, in its decision, the agency must support its conclusions by appropriate findings of fact. The agency's decisions are subject to judicial review. In its consideration of an acquisition or addition, the agency is expected to approve only allocations to provide services "for which competition does not or will not appropriately allocate supply."[2] For those health services "for which competition appropriately allocates supply, ... states should give priority ... to actions which would strengthen the effect of competition on the supply of such services."[3] To this extent only is competition considered. Specifically, there is no consideration by the state agency of costs and charges after acquisition,[4] although the federal statute authorizes such review.[5] In short, for the reasons stated, North Carolina's CON statute leaves entities like appellant PIA entirely free to indulge in such post-acquisition activities as price-fixing--activities which Congress intended to curb through the federal antitrust laws.
 
 
 52
 Just what the result can be is illustrated strikingly by what has occurred here. The acquiring hospital expects, after acquisition, to raise rates at the acquired institution. It is obvious from this review of both the NHPRDA and the state act that CON review is not incompatible with federal antitrust law, nor is the NHPRDA so comprehensive a statute that it obviates the need for antitrust scrutiny. Here, then, there is no clear repugnancy.
 
 
 53
 The majority reaches its contrary decision after drawing what I view to be an unwarranted inference that the legislative history of the NHPRDA shows Congressional intent to provide antitrust exemption, and after a consideration of only two cases.
 
 
 54
 The two cases relied upon by the majority are National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City and Gordon v. New York Stock Exchange. The former involves precisely the question of whether the NHPRDA implicitly repealed the antitrust laws for actions arising under it; the latter, whether the Securities Exchange Act of 1934 had repealed the antitrust laws by implication, for fixed rates required by the New York Stock Exchange. Thus on the facts alone, National Gerimedical would seem to be a precedent with more authority in this case. Nonetheless, the majority found Gordon controlling, apparently only because the Gordon court had found an implied repeal of the antitrust laws essential to make the statute in question, the 1934 Securities Exchange Act, work--whereas the National Gerimedical court had rejected the claim of implied immunity because the facts of the case showed no "plain repugnancy" between the NHPRDA and federal antitrust laws.
 
 
 55
 Admittedly, in National Gerimedical the state had implemented no CON requirement. Plaintiff hospital, whose failure to obtain CON approval was the basis for Blue Cross's refusal to grant it participant status, had thus been under no obligation to obtain such approval. When plaintiff hospital alleged that Blue Cross was violating the antitrust laws by refusing to grant the hospital participant status, Blue Cross responded by claiming antitrust immunity under the NHPRDA. The court did state, 452 U.S. at 393 n. 18, 101 S.Ct. at 2424 n. 18, that its holding was not to preclude other allegations of antitrust immunity. It also said that a "crucial" factor, id. at 390, 101 S.Ct. at 2422, in its holding was the absence of regulatory (CON) review of Blue Cross's decision. However, the court said neither that its decision would have been different if there had been mandatory CON review, nor that the absence of CON review was the only, or even the pivotal, reason for its decision.
 
 
 56
 Appellant PIA's argument, in light of the above discussion, does not seem to me to be sustainable on the ground of either precedent or legislative history. Congress's finding that competition is an inadequate safeguard against abuses in the health care industry was based upon the inefficacy of competition in keeping down medical costs. Removing the possibility of antitrust scrutiny would simply exacerbate that problem, by allowing unchecked rate-setting. Congress has shown its grave concern over the spiralling costs of health care. The federal antitrust laws are a weapon created by Congress to prevent unfair competition and monopoly from aggravating the problem of high costs for the consumer. Congress cannot have intended to immunize from antitrust scrutiny the post-acquisition activities of health care providers, simply because the acquisitions themselves must pass CON review. CON review, the NHPRDA, and the federal antitrust laws may not have identical, overlapping goals, but they do have the consistent goal of insuring that health care costs are not unnecessarily and artificially inflated. State regulation of acquisitions and expenditures in areas not responsive to competition alone is not, as the majority seems to contend, irreconcilable with protecting competition where it does exist within the industry. There is no need to suppress the federal antitrust laws in order to make fully effective the NHPRDA and North Carolina's CON review statute. Indeed, there is no justification for finding such an implied repeal. I believe that PIA's acquisition of Highland may claim no immunity from federal antitrust scrutiny. I dissent.
 
 
 
 [1]
 Space does not permit us to abstract the very informative and comprehensive Senate Report here. Its essence follows (from the Report p. 7879): "In the Committee's view, effective comprehensive health planning activities are an absolute prerequisite to the implementation of a national health insurance program which will result in the provision of high quality personal health services to all Americans at reasonable costs."
 
 
 [2]
 These goals of HSA planning are consistent with the more particularized national health priorities enumerated in the Act. See 42 U.S.C. Sec. 300k-2(a)
 
 
 [3]
 For a general description of the other changes effected by the 1979 amendments, see S.Rep. No. 96, 96th Cong., 1st Sess. 2-3, reprinted in 1979 U.S.Code Cong. & Ad.News 1306, 1307-08
 
 
 [4]
 The amendments also added as a new national health priority, see supra note 2, "[t]he strengthening of competitive forces in the health services industry wherever competition and consumer choice can constructively serve ... to advance the purposes of quality assurance, cost effectiveness, and access." Pub.L. No. 96-79, Sec. 103(a), 93 Stat. 592, 594-95 (1979) (codified at 42 U.S.C. Sec. 300k-2(a)(17))
 
 
 [5]
 The full text of Sec. 300k-2(b) reads as follows:
 (b)(1) The Congress finds that the effect of competition on decisions of providers respecting the supply of health services and facilities is diminished. The primary source of the lessening of such effect is the prevailing methods of paying for health services by public and private health insurers, particularly for inpatient health services and other institutional health services. As a result, there is duplication and excess supply of certain health services and facilities, particularly in the case of inpatient health services.
 (2) For health services, such as inpatient health services and other institutional health services, for which competition does not or will not appropriately allocate supply consistent with health systems plans and State health plans, health systems agencies and State health planning and development agencies should in the exercise of their functions under this subchapter take actions (where appropriate to advance the purposes of quality assurance, cost effectiveness, and access and the other purposes of this subchapter) to allocate the supply of such services.
 (3) For the health services for which competition appropriately allocates supply consistent with health systems plans and State health plans, health systems agencies and State health planning and development agencies should in the performance of their functions under this subchapter give priority (where appropriate to advance the purposes of quality assurance, cost effectiveness and access) to actions which would strengthen the effect of competition on the supply of such services.
 
 
 [6]
 In 1981, the North Carolina General Assembly substantially amended the certificate of need law. N.C.Gen.Stat. Secs. 131-175 to -187 (Supp.1981). The amendments, however, do not apply to this case. Any references to the North Carolina certificate of need law will be to the pre-amendment statute unless otherwise indicated. The 1981 amendments abolish the requirement of a certificate of need for the purchase of an existing hospital in the circumstances presented here
 
 
 [7]
 The Attorney General, assuming he has standing under the state statute, has elected not to seek review within the state system of the adverse administrative determination
 
 
 [8]
 The NHPRDA does give HSA's, and the members and employees of HSA's and Statewide Health Coordinating Councils limited immunity from damages under any federal or state law. 42 U.S.C. Secs. 300l-1(b)(4), 300m-3(d). The United States as amicus curiae argues that these provisions indicate the full extent of Congressional intent to grant antitrust immunity and therefore foreclose any finding of implied antitrust immunity. We find this argument unpersuasive
 These provisions resemble the general grants of limited immunity given to employees under other federal programs for acts done within the scope of their employment. See, e.g., 40 U.S.C. Sec. 489 (granting good faith immunity to federal officers and employees involved in the transfer and disposal of government property); 42 U.S.C. Sec. 300j-6(a) (granting immunity to federal officers, agents, and employees involved in the federal water systems safety program). The fact that Congress has granted health systems agencies and their members limited immunity under the statute for the performance of their duties, we think, is no indication that no further immunity may be implied to others not mentioned and not a part of a health system agency.
 In addition, such a holding, that would foreclose all claims of implied antitrust immunity, would run counter to the Supreme Court's language in National Gerimedical Hospital & Gerontology Center v. Blue Cross, 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981). There, the Court recognized the validity of antitrust immunity claims under the NHPRDA in the proper factual context, citing the United States' statement as amicus curiae that " 'there are some activities that must, by implication, be immune from antitrust attack if HSA's and State Agencies are to exercise their authorized powers.' " Id. at 393 n. 18, 101 S.Ct. at 2424 n. 18 (quoting the Brief for the United States as Amicus Curiae at 16 n. 11).
 
 
 [9]
 This provision was part of the Health Planning and Resources Development Amendments of 1979. See Pub.L. No. 96-79, Sec. 117(d)(1), 93 Stat. 592, 617 (1979)
 In 1981, North Carolina amended its law to cover only the acquisitions that are required by the NHPRDA to be covered. See N.C.Gen.Stat. Sec. 131-176(17)(b), (j) (Supp.1981). However, as discussed in note 6, supra, this amendment is inapplicable to the present case.
 
 
 [10]
 Those activities that Congress determined should be exempt from certificate of need review are clearly specified in the NHPRDA. See, e.g., 42 U.S.C. Sec. 300m-6(e)(1) (granting a limited exemption for the acquisition of major medical equipment not owned by or located in a health care facility); see also id. Sec. 300m-6(b)(1)
 
 
 [11]
 In commenting on the proposed regulations, the Secretary of Health, Education, and Welfare recognized that mere acquisitions could affect health care costs. 45 Fed.Reg. 20,028 (1980)
 
 
 [12]
 The Supreme Court quoted this statement in part in National Gerimedical Hospital & Gerontology Center v. Blue Cross, 452 U.S. at 393 n. 18, 101 S.Ct. at 2424 n. 18
 
 
 [13]
 The dissent argues and emphasizes as a reason for its position that "Congress cannot have intended to immunize from antitrust scrutiny the post-acquisition activities of health care providers, simply because the acquisitions themselves must pass CON review." (Italics from the dissent) This argument reads too much into our opinion. It is only the acquisition that is immunized, not post-acquisition activities, which, of course, are not immune. For a good current discussion of the requirement of anticompetitive conduct, not mere monopoly, in the context present here, see Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir.1979)
 
 
 [1]
 N.C.Gen.Stat. Secs. 31-175 et seq. (1981)
 
 
 [2]
 42 U.S.C. Sec. 300k-2(b)(2)
 
 
 [3]
 42 U.S.C. Sec. 300k-2(b)(3)
 
 
 [4]
 N.C.Gen.Stat. Sec. 131-177
 
 
 [5]
 42 U.S.C. Sec. 300m-5(a)