**STATE OF NORTH CAROLINA ex rel. Rufus L. EDMISTEN, Attorney General, Appellant,**

v.

**P.I.A. ASHEVILLE, INC.; First Washington Group, Inc.; Consolidated Health Systems, Inc.; Psychiatric Institutes of America, Inc., Appellees,**

**United States of America, /A Amicus Curiae.**

**No. 82–1058.**

United States Court of Appeals, Fourth Circuit.

On Petition for Rehearing.

Argued April 3, 1984.

Decided July 16, 1984.

H.A. Cole, Jr., Sp. Deputy Atty. Gen., Raleigh, N.C. (John R. Corne, Associate Atty. Gen., Raleigh, N.C., on brief), for appellant.

Andrea Limmer, Dept. of Justice, Washington, D.C. (William F. Baxter, Asst. Atty. Gen., John H. Carley, Gen. Counsel, David M. Narrow, Peter M. Kazon, Bureau of Competition, F.T.C., Barry Grossman, Dept. of Justice, Washington, D.C., on brief), for amicus curiae.

Joel I. Klein, Washington, D.C. (Robert D. Luskin, Onek, Klein & Farr, Washington, D.C., John S. Stevens, Redmond, Stevens, Loftin & Currie, Asheville, N.C., Martin J. Gaynes, Bonner, Thompson, O'Connell, Gaynes & Middlekauff, Washington, D.C., on brief), for appellees.

Before WINTER, Chief Judge, and RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN and CHAPMAN, Circuit Judges, sitting *en banc*.

DONALD RUSSELL, Circuit Judge:

A panel of this court initially considered this case in July 1982. The facts were fully stated in the panel opinion, *State of North Carolina ex rel. Edmisten v. P.I.A. Asheville, Inc., et al.,* 722 F.2d 59 (4th Cir.1983). Given the opportunity to reconsider this case *en banc*, we now reverse the judgment of the district court.

At issue here is the acquisition by Psychiatric Institutes of America (hereafter P.I.A.), the largest national private operator of acute psychiatric hospitals in America, of 50% [1] of the stock of Highland Hospital, a psychiatric facility formerly a division of Duke University Medical Center. P.I.A. also owns and operates the only other private psychiatric hospital in the Western North Carolina Health Systems Agency (hereafter WNCHSA).[2] The National Health Planning and Resources Development Act of 1974 (NHPRDA), 42 U.S.C. § 300k *et seq.*, required states to pass certificate of need legislation or risk losing federal funds, § 300m–2(a)(4)(B). Under the statute passed by North Carolina, N.C. Gen.Stat. § 131–178(a), P.I.A. had to obtain a certificate of need for the acquisition of Highland, although under the federal statute, a purchase not entailing a change in bed capacity required no certificate.[3] Before the certificate of need was granted, the Attorney General of North Carolina brought this suit challenging the acquisition under federal and state antitrust laws, the Sherman Act, 15 U.S.C. § 1 *et seq.;* the Clayton Act, 15 U.S.C. § 12 *et seq.;* and North Carolina General Statutes §§ 75–1 and 75–2. P.I.A. here contends that since it obtained a certificate of need for the acquisition, and underwent the stringent certificate of need review process mandated by the North Carolina Health Planning Resources Development Act of 1978, N.C. Gen.Stat. § 131–175 *et seq.*, the acquisition may not now be challenged on antitrust grounds. In the alternative, P.I.A. argues that state action immunity bars the Attorney General's suit. We find that neither the statutes nor state action immunity bars this suit.

I.

We first consider the question of state action immunity, which the panel did not reach. We hold that this doctrine, explained by the Supreme Court in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), cannot prevent the acquisition of Highland Hospital from being called into question under the antitrust laws.

The court in *Parker* held that a state agriculture marketing plan which might otherwise have run afoul of federal antitrust laws was immune from antitrust challenge. The court reasoned that the Sherman Act was not intended to apply to action undertaken by the state in its official capacity. Until recently, it was questionable whether private parties like P.I.A. could claim state action immunity, *see, e.g., Trucking Unlimited v. California Motor Transport Co.,* 432 F.2d 755, 760 n. 7 (9th Cir.1970); *aff'd.* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 590–92, 96 S.Ct. 3110, 3117–18, 49 L.Ed.2d 1141 (1976). Of late, the doctrine, still somewhat illogically called state action immunity, *see, Hecht v. Pro Football, Inc.,* 444 F.2d 931, 935 (D.C. Cir.1971), has been successfully invoked by private parties. Since the Supreme Court's decisions in *Bates v. State Bar of Arizona,* 433 U.S. 350, 362, 97 S.Ct. 2691, 53 L.Ed.2d

---

1. Staff doctors own the other 50%.

2. A 26 county health service area surrounding Asheville. The WNCHSA is a health systems agency as defined by Title XV of the Public Health Service Act, and the Rules and Regulations implementing that act. *See, N.C.Gen.Stat.* § 131–176(12). It is the WNCHSA which grants certificates of need for all acquisitions in that area.

3. The federal statute requires that certificates of need apply to the "obligation of capital expenditures within the state, and the offering within the state of new institutional health services and the acquisition of major medical equipment," § 300m–2(a)(4)(B), but it also requires that for the acquisition of an existing facility, a certificate of need shall be required *only if* "the services or bed capacity will be changed in being acquired," § 300m–6(d)(1)(B) [emphasis added].

810 (1977), and *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the right of a private entity to claim *Parker* immunity is clear. Under *Hoover v. Ronwin,* —— U.S. ——, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984), a private party has that right even when the state does not compel, but only "authorizes" or "approves" the activity, as North Carolina did here. But under the standard established by those cases, P.I.A. cannot prevail on the merits.

■ To qualify for state action immunity, a claimant must show two things. One is that there be a "clearly articulated state policy." The second part of the state action immunity two-part test, as set forth in *Midcal,* is that the statutory scheme, here the certificate of need review provision, be subject to *ongoing* state supervision.

■ The certificate of need requirements represent a "clearly articulated state policy," by the state of North Carolina to regulate even acquisitions of existing health care facilities which result in no change in services or bed capacity. We question whether a clearly articulated policy by the federal government can be found here, *see* note 3, *supra,* but the state action immunity doctrine, by definition, is restricted to conduct undertaken under the aegis of a state rather than the federal government. Here, since the second part of the test for state action immunity is clearly not met, the first part's being met cannot legitimize P.I.A.'s activity.

The legislative histories of both the NHPRDA of 1974 and of the 1979 amendments thereto, and North Carolina's certificate of need legislation, N.C.Gen.Stat. § 131–175 *et seq.,* do show that Congress and the North Carolina legislature were concerned about the unrelenting rise in the cost of health care, and about wasteful, duplicative major acquisitions by health care providers. The Findings of Fact incorporated in the North Carolina statute at § 131–175 include the statements that:

(1) .... the forces of free market competition are largely absent and government regulation is therefore necessary to control the cost, utilization, and distribution of health services. (2) ... the continuously increasing cost of health care services threatens the health and welfare of the citizens of this state ... (4) ... [there has been] costly duplication and underuse of facilities ...

*See, State of North Carolina ex rel. Morrow v. Califano,* 445 F.Supp. 532, 534 (E.D. N.C.1977); *aff'd.,* 435 U.S. 962, 98 S.Ct. 1597, 56 L.Ed.2d 54 (1978); *see also,* S.Rep. No. 93–1285, 93d Cong., 1st Sess. (Nov. 12, 1974), *reprinted in,* 1974 U.S.Code Cong. & Admin.News, at 7842, 7878; *see also,* 42 U.S.C. § 300k–2(b)(1): "... there is duplication and excess supply of certain health services and facilities, particularly in the case of inpatient health services."

To control these burgeoning costs, Congress required each state to pass legislation making certificates of need mandatory for major expenditures for health care services, equipment, or facilities. When the Act was amended in 1979, the Senate Report said:

The legislation recognized State certificate of need programs to be the basic component in an overall effort to control the unnecessary capital expenditures which contribute so greatly to the total national health bill.

The development of new health resources was tied directly to approved state medical facilities plans. Health systems agencies were to be given special funds to encourage development of needed health resources and services in their respective areas.

S.Rep. 96–96, 96th Cong., 1st Sess. (April 26, 1979) at 5, *reprinted in* 1979 U.S.Code Cong. & Admin.News, vol. 2 at 1310.

North Carolina acted promptly to show its support for the NHPRDA's goals of making better health care more widely available, and of containing costs. In 1978, the North Carolina HPRDA, N.C.Gen.Stat.

§ 131–175 *et seq.*, was passed.[4] That act required that a certificate of need application be reviewed by the health systems agency of the health service area where the proposed expenditure would be made, § 131–182(a)(1). Thirteen criteria were to be used in deciding whether to grant a certificate of need, § 131–181.[5] These criteria were to be balanced against the relationship of the proposed expenditure to the state's overall health care goals. Certificates of need could be revoked for failure to satisfy the conditions on which they were granted. North Carolina, then, was sufficiently interested in the regulation of health care provision to legislate extensively in the area. North Carolina's certificate of need program is, we note, even stronger than was mandated by the federal NHPRDA. *Compare*, N.C.Gen.Stat. §§ 131–176(17)(b), 131–176(17)(c), and § 131–178, *to* 42 U.S.C. § 300m–6(d)(1).[6] Under the circumstances, we acknowledge that there is a strong argument for, and assume, but without deciding that there *was* a clearly articulated and affirmatively expressed state policy to regulate health care providers' expenditures. However,

even if North Carolina has regulated such activity as P.I.A.'s, that requirement's being met cannot overcome any failure of the certificate of need requirements to meet the other half of the test—the requirement of continuing state scrutiny.

An examination of the North Carolina certificate of need program shows that after a proposed acquisition passes certificate of need review, the state makes no attempt to monitor the use of the acquisition, *see*, N.C.Gen.Stat. §§ 131–175 to 131–187. There is no active supervision at all. No provision, for example, regulates post-acquisition prices. The state does provide for penalties for failure to obtain a certificate of need in situations where one is required, and for failure to incur a financial obligation authorized by a certificate of need. But the statute in no way attempts to monitor the conduct of health care providers to be sure it is in harmony with the expressed goals of the NHPRDA, and with the Findings of Fact in the North Carolina legislation. The mandatory certificate of need requirement constitutes the *sum* of North Carolina's foray into the health ser-

---

4. N.C.Gen.Stat. §§ 131–175 to 131–188 were repealed by Session Laws 1983, c. 775, s. 1, effective Jan. 1, 1984.

5. (1) The relationship of the proposed project to the State Medical Facilities Plan, the State Health Plan, and the State Mental Health Plan. (2) The relationship of services reviewed to the long-range development plan of the persons providing or proposing such services. (3) The need that the population served or to be served by such services has for such services. (4) The availability of less costly or more effective alternative methods of providing such services. (5) The immediate and long-term financial feasibility of the proposal, as well as the probable impact of the proposal on the costs of and charges for providing health services. (6) The relationship of the services proposed to be provided to the existing health care system of the area in which such services are proposed to be provided. (7) The availability of resources, including health manpower, management personnel, and funds for capital and operating needs, for the provision of the services proposed to be provided and the availability of alternative uses of such resources for the provision of other health services.

(8) The relationship, including the organizational relationship, of the health services proposed to be provided to ancillary or support services. (9) Special needs and circumstances of those entities which provide a substantial portion of their services or resources, or both, to individuals not residing in the health service areas in which the entities are located or in adjacent health service areas. Such entities may include medical or other health professional schools, multidisciplinary clinics, and specialty centers. (10) [applicable only to the needs of health maintenance organizations] (11) [applicable only to the needs of research projects] (12) [applicable only to construction projects] (13) The need that the medically underserved portion of the population, especially those people located in rural or economically depressed areas, has for such services, and the extent to which the project under review proposes to meet that need.

6. The NHPRDA did not require states to require certificate of need review for acquisitions not involving a change in bed capacity. Thus, it cannot be said that Congress has shown any intent at all with respect to the type of acquisition here in question.

vices regulation arena established by the NHPRDA. This point is well-illustrated here, where P.I.A. has admitted to raising its prices after it bought Highland Hospital.

The Supreme Court's most recent pronouncement on the state action immunity doctrine reaffirmed the necessity for " 'active supervision' " by the state legislature or state supreme court, *Ronwin*, 104 S.Ct. at 1995–96. The court noted that where the conduct being challenged was effectively that of the state itself—either the legislature, or, as was the case in *Ronwin*, the state supreme court—the *Parker* doctrine was inapplicable. But here there can be no contention that P.I.A.'s conduct is in fact that of the state itself. *Ronwin* in no way changes the *Midcal* test for private conduct merely approved by the state, 104 S.Ct. at 1995–96.

P.I.A. has argued that under *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 109, 99 S.Ct. 403, 411, 58 L.Ed.2d 361 (1978), it meets the test for state action immunity. That decision dealt almost entirely with due process rights to a hearing. In one half-page, however, the court did say that the regulatory scheme there in question is:

> a system of regulation, clearly articulated and affirmatively expressed, designed to displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships. The regulation is therefore outside the reach of the antitrust laws under the state action exemption.

By that brief statement, the court suggests that the *only* requirement for inferring implied immunity under the state action doctrine is that the statutory scheme express a clearly articulated state policy. The "continuing supervision" requirement for the state action doctrine is not mentioned. However, P.I.A.'s reliance on this case is misplaced. In *Midcal*, decided two years *after New Motor Vehicle Board*, the Supreme Court plainly set out the two-part test for state action immunity which *included* continuing supervision. Although

P.I.A. cites *New Motor Vehicle Board* for the proposition that the *absence* of continuing supervision after the acquisition of Highland Hospital need not mean that state action immunity is inappropriate, the argument is unpersuasive. *New Motor Vehicle Board* held state action immunity applicable when *only* the "clearly articulated state policy" half of the subsequently expressed two-part *Midcal* test was met, so the fact that there was no ongoing supervision was irrelevant to the court's finding, and was not considered.

The total absence of supervision provided by North Carolina after the issuance of a certificate of need is in contrast to the situation in *Bates*, 433 U.S. at 362, 97 S.Ct. at 2698, and corresponds to the situation in *Midcal*, 445 U.S. at 106, 100 S.Ct. at 943. There, the court found that California did not monitor market conditions or "engage in any 'pointed reexamination' of the program," and so found that the second prong of the state action immunity test had not been met. We follow the *Midcal* court, and decline to find P.I.A.'s conduct unreviewable on *Parker v. Brown* grounds.

■ We also note that the conduct here was voluntarily initiated by P.I.A., and not in any way advocated, much less compelled, by the state. Some state action immunity cases have emphasized that compulsion by the state is a necessary prerequisite to a finding of implied exemption from the antitrust laws, *see. e.g., Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975). This argument, too, militates against a finding of state action immunity here. Thus P.I.A.'s *Parker v. Brown* argument must fail. For all the foregoing reasons, we find no merit to P.I.A.'s *Parker v. Brown* claim.

## II.

We now reach the question whether there is justification in the language of the NHPRDA, or in its legislative history, to find that Congress intended for antitrust immunity to be part of the NHPRDA. We recognize that "... there is no simplistic and mechanically universal doctrine of im-

plied antitrust immunity; each of the Supreme Court's cases is decisively shaped by considerations of the special aspects of the regulated industry involved," *Phonetele, Inc. v. A.T. & T. Co.*, 664 F.2d 716, 727 (9th Cir.1981). With this caveat in mind, we will attempt to resolve this question.

■ There are two principal questions to be answered in deciding when implied repeal of the antitrust laws may be inferred: (1) Is there an affirmative showing of a legislative intent to repeal; and (2) Can the irreconcilability of federal antitrust laws and the regulatory scheme in question be shown,[7] *National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City*, 628 F.2d 1050 (8th Cir.1980); *reversed*, 452 U.S. 378, 382–83, 101 S.Ct. 2415, 2418–19, 69 L.Ed.2d 89 (1981); *see also*, discussion at 628 F.2d 1054; *Essential Communications Systems, Inc. v. A.T. & T.*, 446 F.Supp. 1090, 1094 (D.N.J. 1978).

### A.

■ The "Congressional intent" test for antitrust immunity is broader than the plain repugnancy inquiry, which it embraces. Thus, in trying to determine legislative intent, we look for repugnancy and also consider legislative history, statutory language, and other factors that may suggest what Congress meant, *Oahu Gas Services Inc. v. Pacific Resources, Inc.*, 460 F.Supp. 1359, 1372 (D.Haw.1978), *Gordon v. New York Stock Exchange*, 422 U.S. 659, 682–83, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975), *Mount Hood Stages v. Greyhound Corp.*, 555 F.2d 687, 692 (9th Cir. 1977); *cert. denied in part*, 434 U.S. 1008, 98 S.Ct. 716, 54 L.Ed.2d 750; *vacated and remanded on other grounds*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978); *Phonetele*, 664 F.2d at 726–27.

■ The language of the NHPRDA itself provides some clues. While the find-ings of fact in the NHPRDA recognize the shortcomings of competition in improving health services provision, 42 U.S.C. § 300k–2(b)(1), the very section in which these findings appear is entitled "National health priorities; strengthening competition in the supply of services." The overriding aim was obviously to buttress competition; the candid recognition *in that context* of competition's failures is not tantamount to a finding that Congress intended to bar the use of the most powerful pro-competitive laws, the federal antitrust laws, for all NHPRDA-covered activity.

We note again that the NHPRDA does *not* require state certificate of need programs to review acquisitions entailing no change in bed capacity. While the statute left states free to pass certificate of need legislation more stringent than was required, of course there can be no claim that Congress intended certificate of need review boards to approve acquisitions like P.I.A.'s of Highland Hospital. If Congress did not intend for certificate of need review boards to approve such acquisitions, it follows that Congress cannot have meant for certificate of need review to supplant antitrust review, although naturally one may argue that the *state's* certificate of need requirement showed a *North Carolina* intent with respect to antitrust review.

We do not find the NHPRDA's legislative history dispositive of the question of Congressional intent.[8] For implied immunity, as for implied rights of action, although:

> The touchstone is now Congressional intent. . . . legislative history is unlikely to reveal affirmative evidence of a Congressional intent to authorize a specific procedure that the statute itself fails to mention, *Middlesex City Sewerage Authority v. Sea Clammers*, 453 U.S. 1, 25 [101 S.Ct. 2615, 2629, 69 L.Ed.2d 435] (1981) (Stevens, J., concurring in part and dissenting in part).

---

**7.** *See*, R. Balter and C. Day, "Implied Antitrust Repeals: Principles for Analysis," 86 Dick.L. Rev. 447, 452 (1982).

**8.** We cannot consider the legislative history of North Carolina's certificate of need program because North Carolina does not publish legislative histories for its statutes.

The legislative history of the 1979 amendments is if anything *less* persuasive of P.I. A.'s position than was that of the 1974 Act, which was totally silent on the subject. The legislative history of the 1979 amendments, after all, shows that they were added in order to provide for competition merely to be *supplemented* by regulation, at least as long as regulation allocates supply in accordance with planning goals, Frances H. Miller, "Antitrust and Certificate of Need: Health Systems Agencies, the Planning Act, and Regulatory Capture," 68 Geo.L.J. 873, 891 (1980); *see also, National Gerimedical,* 452 U.S. at 387, 101 S.Ct. at 2421. The 1974 Act, in contrast, had nothing in its legislative history to indicate what Congress intended the relationship between regulation and competition to be. *See generally, National Gerimedical,* 628 F.2d at 1050. And, although *National Gerimedical* left open the possibility of antitrust immunity under the NHPRDA, 452 U.S. at 393 n. 18, 101 S.Ct. at 2424 n. 18, we are entirely unconvinced that the situation here presented is what the Supreme Court contemplated when it refused to "foreclose future claims of antitrust immunity in other factual contexts," *id.* at *id.* The court provided an example of conduct which it might consider covered by implied immunity; P.I.A.'s activity here complained of in no way resembles the example, which suggested that voluntary cooperation between health care providers and health systems agencies might not be considered illegal collusion.

Moreover, there are convincing public policy reasons which militate against a finding of implied immunity here. That the federal antitrust laws are a "fundamental national economic policy," *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 218, 86 S.Ct. 781, 784, 15 L.Ed.2d 709 (1966), and have an "indispensable role ...in the maintenance of a free economy," *United States v. Philadelphia National Bank,* 374 U.S. 321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963), no one can seriously dispute.

As one commentator has noted, the goal of the NHPRDA is supposed to be making better health care more widely available. If this is the aim, however, it is hard to understand why the Sherman Act should not be applied to cases involving regulatory restraints on competition: "Courts have been far too willing to let blatantly anticompetitive conduct slip through the cracks of the Sherman Act by finding that the challenged conduct falls into an antitrust exception," *Note,* "Antitrust and Health Planning under the 1974 NHPRD Act," 7 J. Corp. L. 311, 330 (1982). That article goes on to contend that the "basic flaw" in the certificate of need program is that the restrictions on competition tolerated by the statute do not ensure the availability of the regulated services. Here, the requirement of certificate of need review for an acquisition resulting in no change in bed capacity in no way helped to ensure that more people had access to the health care services in question, so that the justification that certificate of need review replaced antitrust review is not applicable. The article also suggests that the certificate of need program promotes special interests (presumably those of the health care providers who sit on certificate of need review boards). Courts reviewing certificate of need cases have also failed to address the policy question of how much anticompetitive conduct will be, and should be, approved as being in the public's best interest. *Id.* at 330–31.

Many cases have used the availability of remedies as an indicium of whether Congress intended for a regulatory scheme to pre-empt the antitrust laws. Where the regulatory scheme provides for remedies comparable to those available under the Sherman or Clayton Acts, for example, one may infer that the agency was given the power to provide remedies because the antitrust laws were assumed not to be available. If the extent of the remedy available under the regulatory scheme is different from that available under antitrust laws, it is "more probable" that Congress meant the regulatory scheme to act with, and not instead of, the antitrust laws, *Phonetele,* 664 F.2d at 735, 735 nn. 47, 48. The Civil Aeronautics Board, for instance, has inde-

pendent power to enforce the antitrust laws, and *Pan American World Airways, Inc. v. U.S.*, 371 U.S. 296, 304, 83 S.Ct. 476, 481, 9 L.Ed.2d 325 (1963), is one of the very few cases in which the Supreme Court has found implied antitrust immunity. The Federal Communications Commission, on the other hand, has no remedial powers, and assertions of implied immunity based on the alleged pervasiveness of FCC regulations have met with little success. *See, e.g., U.S. v. Radio Corp. of America*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959).

In the area of utilities regulation, the Supreme Court has noted that the Federal Power Commission cannot provide remedial relief for those aggrieved by Clayton Act violations perpetrated in connection with FPC-regulated activity. Since there is no other means of obtaining relief, the court has reasoned, there can have been no Congressional intent to hold the antitrust laws in abeyance with respect to FPC-regulated conduct. Thus the remedies question is important to a finding of Congressional intent, *California v. Federal Power Commission*, 369 U.S. 482, 486, 82 S.Ct. 901, 904, 8 L.Ed.2d 54 (1962); *Otter Tail Power Co. v. U.S.*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

North Carolina's certificate of need law specifies a $20,000 fine to be levied for failure to obtain a certificate of need when one is required, N.C.Gen.Stat. § 131–187(g). If the fine is not paid, a civil suit may be brought by the Department of Human Resources. The statute allows a "person aggrieved" (defined at N.C.Gen.Stat. § 150A–2(6)) to bring suit to enforce the certificate of need law, N.C.Gen.Stat. § 131–188. The Secretary of Human Resources, or any "person aggrieved," may also sue for injunctive relief if a party institutes new health services without obtaining the required certificate of need, N.C.Gen.Stat. § 131–187(i).

These are the only remedies provisions in the North Carolina certificate of need law. None of them resembles the treble damage provision available for a violation (such as was here alleged) of sections 1 and 2 of the Sherman Act.

■ Besides not providing remedies for violations of its certificate of need law, North Carolina law seems not to give a remedy for post-acquisition monopolistic conduct. If the acquisition of Highland is held immune from antitrust scrutiny, we think it unlikely that the state will be in a position to sue P.I.A. under federal antitrust laws for raising its rates after the purchase. Certainly the certificate of need review board has no authority to restrain such rate-raising. If it did, that would be some evidence that there is continuing supervision by the regulatory agency. Since it does not, and since it is unlikely that any entity will be able to prevent P.I.A.'s conduct if we hold it immune here, the reasons for our not finding implied immunity are strengthened: "The inference that Congress intended to displace conventional antitrust remedies is certainly stronger if the agency is authorized to award ... forms of antitrust relief [besides injunctions]. A strict test for implied immunity should therefore include the remedy requirement." *Note*, "A.T. & T. and the Antitrust Laws: A Strict Test for Implied Immunity," 85 Yale L.J. 254, 263 (1975). And, we note that even if the remedies provided by the statutes here were comprehensive or pervasive, which they are not:

> [A] comprehensive remedial scheme can evidence a Congressional decision to preclude other remedies ... However, we must not lose sight of the fact that our evaluation of a statute's express remedies is merely a tool used to discern Congressional intent; it is not an end in itself. No matter how comprehensive we may consider a statute's remedial scheme to be, Congress is at liberty to leave other remedial avenues open, *Middlesex*, 453 U.S. at 28 [101 S.Ct. at 2630].

The cases demonstrate that for a finding of implied immunity to be made without clear repugnancy, the regulation in question must be "pervasive," *see, e.g., Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). Perva-

siveness, in other words, may suffice to show Congressional intent to repeal by implication. As was suggested in *National Gerimedical*, 452 U.S. at 392, 101 S.Ct. at 2423, it may be argued that:

> [T]he fundamental assumption of Congress ...[in passing the NHPRDA] was that competition was not a relevant consideration in the health care industry. If so, although that industry is not regulated in any comprehensive fashion, it might be concluded that Congress intended 'pervasive' cooperation and planning without the interference of antitrust suits.

The court in *National Gerimedical*, however, went on to find no such pervasiveness, and no blanket implied repeal, *id.* at 393, 101 S.Ct. at 2424. As expressed by one court, "pervasiveness" has three "primary indicia:"

> (1) Legislative history indicating a legislative intent to subordinate antitrust to regulatory policy;
>
> (2) Duty to actively enforce a nondiscretionary antitrust standard of administrative regulation;
>
> (3) The availability of remedial relief under the regulatory scheme commensurate with that of the antitrust laws. *Oahu*, 460 F.Supp. at 1374; *see also*, *California v. FPC*, 369 U.S. at 485, 82 S.Ct. at 903; *U.S. v. R.C.A.*, 358 U.S. at 346, 350, 79 S.Ct. at 466.

Stated slightly differently by the Ninth Circuit, the three indicia are:

> (1) Explicit Congressional approval of the ultimate anti-competitive effect of the challenged conduct;
>
> (2) Explicit authorization by Congress to an agency or private entity to order the challenged anticompetitive conduct;
>
> (3) No inconsistency between the challenged conduct and an express policy of the governing agency. *Phonetele*, 664 F.2d at 731–32.

The public interest standard under which many regulatory agencies operate *precludes* a finding of pervasiveness, *Otter Tail*, 410 U.S. at 374, 93 S.Ct. at 1028, and similarly, for industries operating under the "business judgment" standard, "courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws," *id.*, at *id.* Even the maintenance of a "close surveillance" by an agency does not show pervasiveness, *Philadelphia National Bank*, 374 U.S. at 352, 83 S.Ct. at 1735.

We find that the North Carolina HPRDA entirely fails to meet the first of the above-cited pervasiveness tests. True, the certificate of need program's legislative history shows an intent to subordinate antitrust concerns to legislative policy, to the extent that competition has been ineffective in the health care field. P.I.A. and the panel decision in this case relied heavily on that legislative history. We, however, note that the NHPRDA's legislative history also shows concern for allowing competition to operate as fully as possible, so that the benefits of competition will be used, while the regulatory scheme takes over only when competition breaks down; *see*, discussion at p. 10 *supra*. Since the object of the antitrust laws is to preserve the benefits of free competition, we can safely say that this legislative history reflects concern for the antitrust laws.

Moreover, the certificate of need system entirely omits the second and third parts of the pervasiveness test cited above. The certificate of need program has no provision for remedial relief approaching that provided by the antitrust laws, nor does it impose a duty on anyone to enforce an antitrust standard.

We are equally unable to find that the scheme here in question passes muster under the Ninth Circuit pervasiveness standard. The legislative history of the NHPRDA, while recognizing the shortcomings of competition in the health care market, hardly was explicit in approving monopolies. More clearly still, the North Carolina HPRDA did not authorize anyone to "order" anticompetitive conduct. At most, the statutes allowed the granting of permission (via a certificate of need) to undertake conduct which might ultimately prove

anticompetitive. Finally, we perceive a significant inconsistency between the expressed goals of North Carolina's HPRDA and the conduct of P.I.A. in raising its rates after obtaining a monopoly in the WNCHSA area. Hence, we agree with the Supreme Court in *National Gerimedical, supra,* and find no pervasiveness in the NHPRDA's regulatory scheme such as would insulate P.I.A.'s conduct.

### B.

■ If (1), the legislative intent part of the implied immunity test, is not dispositive, then only if (2), the clear repugnancy standard, is met can an implied repeal be found. The courts are in agreement on the irreconcilability standard, also expressed as "clear" or "plain" repugnancy, *Philadelphia National Bank,* 374 U.S. at 351, 83 S.Ct. at 1735, even though their means of expressing the standard may have varied on occasion.[9] Where plain repugnancy does exist, the antitrust laws may be held repealed only to the minimum extent necessary to resolve the repugnancy, *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963); *Georgia v. Pennsylvania Railroad,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); *United States v. Borden Co.,* 308 U.S. 188, 199, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939); *quoting, Wood v. U.S.,* 41 U.S. (16 Pet.) 342, 362–63, 10 L.Ed. 987 (1842). "The guiding principle [is] reconciliation of the two statutory schemes," *Silver,* 373 U.S. at 357, 83 S.Ct. at 1257, rather than "to oust completely the antitrust laws and supplant them" with the regulatory scheme, *Ricci,* 409 U.S. at 300,

93 S.Ct. at 579. A line of cases in the Supreme Court has upheld the plain repugnancy standard,[10] and we see no reason to deviate from this line.

The irreconcilability standard is not always clearly defined in the cases. However, the Supreme Court has at least set a minimum standard for irreconcilability: "It is not enough to show that the two statutes [the antitrust and the regulatory] produce differing results when applied to the same factual situation for that no more than states the problem. Rather, 'when two statutes are capable of co-existence, it is the duty of the courts .. to regard each as effective,'" *Radzanower v. Touche Ross,* 426 U.S. 148, 155, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) [citation omitted] Here, we perceive no such problem. Recipients of certificates of need under North Carolina's HPRDA need only have considered the certificate of need as one step of the process towards a successful acquisition. Review of the proposed acquisition under the standards of the federal antitrust laws could, and should, have been another step undertaken by P.I.A. Instead, P.I.A. chose to act as if receipt of the certificate of need for Highland's acquisition gave it *carte blanche* to ignore other laws with impunity. We cannot find that the reach of the NHPRDA was so broad and powerful.

In reaching our decision that implied repeal cannot be found here, we note the difference between the certificate of need requirements of the NHPRDA, and the regulatory requirements in other cases where statutes were or were not found to have impliedly repealed the antitrust laws.

9. *See, e.g., Oahu,* 460 F.Supp. at 1365; *Borden,* 308 U.S. at 199, 60 S.Ct. at 188; *Philadelphia National Bank,* 374 U.S. at 351, 83 S.Ct. at 1735; *U.S. v. National Association of Securities Dealers,* 422 U.S. 694, 719–20, 95 S.Ct. 2427, 2442–43, 45 L.Ed.2d 486 (1975); *Essential Communications,* 446 F.Supp. at 1094.

10. We recognize that *National Association of Securities Dealers,* as far as we can tell only the second case in which the Supreme Court ever found implied antitrust immunity, represents something of an aberration from this line, since it found such immunity in the face of a mere

potential, rather than an actual, conflict between the regulatory scheme and the antitrust laws. As one court put it, *NASD's* "rationale is quite puzzling, and the import of the decision is unclear," *Oahu,* 460 F.Supp. at 1373. *See also,* "Norton, The Antitrust Immunity Doctrine and *U.S. v. National Association of Securities Dealers:* Stepping on *Otter Tail,*" 28 Hastings L.J. 387, 389 (1976). (It is significant that *NASD* was decided over a strong 4-person dissent.) More recent cases have confirmed the plain repugnancy test; *see, e.g., Cantor,* 428 U.S. at 597–98 n. 37, 96 S.Ct. at 3121 n. 37.

For example, conduct regulated by the Civil Aeronautics Act of 1938 with its all-pervasive regulation and continuing scrutiny of all phases of the airline industry was at issue in *Pan American, supra.* The Supreme Court held that for the particular conduct in question, there had been implied repeal of the antitrust laws when the act was passed, but nonetheless refused to preclude the possibility of future antitrust prosecution under the act. Just after *Pan Am, Silver,* 373 U.S. at 357, 83 S.Ct. at 1257, was decided. There the Court enunciated the now well-known standard that:

> Repeal is to be regarded as implied only if necessary to make the [regulatory] act work, and even then only to the minimum extent necessary.

In *Silver, supra,* the Supreme Court found no irreconcilability between the Securities Exchange Act of 1934 and the antitrust laws, and declined to find immunity from Sherman Act suits. Likewise, in *Ricci, supra,* the plaintiff's claim of antitrust immunity implied by the Commodities Exchange Act was rejected [11], for the reasons that the regulatory scheme had no antitrust standard built in, and was not pervasive. Therefore, the irreconcilability standard was not met.

*Philadelphia National Bank,* 374 U.S. at 352, 83 S.Ct. at 1735, underlines the Supreme Court's reluctance to grant antitrust immunity. There, the Comptroller of Currency had approved a bank merger, *after considering* its antitrust effects. The United States nonetheless brought a Clayton Act suit. Rejecting the claim of immunity, the court noted that the Comptroller had not been required to give the anticompetitive effect factor "any particular weight," when he decided whether to approve the merger. By this reasoning, P.I.A.'s argument that the effect on competition was considered when its certificate of need was granted for Highland carries little weight.

After *Philadelphia National Bank,* Congress amended the Bank Merger Act to incorporate the Clayton Act standards of antitrust review. The Supreme Court still refused to pre-empt Clayton Act challenges to bank mergers, *U.S. v. First City National Bank,* 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). We find little support for P.I.A.'s position in any of these cases.

Our careful consideration of all aspects of the question presented here inexorably leads us to the conclusion that the facts of this case provide no basis for an action as disfavored, and consequently as unusual, as a finding of implied repeal of the federal antitrust laws. The district court' judgment is *REVERSED,* and the case *REMANDED* to the district court for entry of an order consistent with this opinion.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent for the reasons expressed at length in the panel opinion, *North Carolina ex rel. Edmisten v. P.I.A. Asheville, Inc.,* 722 F.2d 59 (4th Cir.1983), and would not find it necessary to reach the applicability of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). I add for emphasis that the only act immune from antitrust scrutiny considered here is the acquisition of the additional hospital facility. 722 F.2d at 68 n. 13. Any activities of the defendants subsequent to the state-approved acquisition which are in violation of the antitrust laws may be challenged as such under the panel opinion.

K.K. HALL and CHAPMAN, Circuit Judges, join in this opinion.

---

**11.** The antitrust action in question had actually been stayed by the Court of Appeals pending certain factual determinations, and the propriety of the stay was reviewed by the Supreme Court.